No. 12868

IN THE SUPREME COURT OF THE STATE OF MONTANA

1975

---

T. G. HAGGERTY and F. P. MESSMER et al.,

Plaintiffs and Respondents,

-vs-

SELSCO, a Utah corporation et al.,

Defendant and Appellant.

---

Appeal from: District Court of the Eighteenth Judicial District,
Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

For Appellant:

Landoe and Gary, Bozeman, Montana
J. Robert Planalp argued, Bozeman, Montana

For Respondents:

Berg, Angel, Andriolo and Morgan, Bozeman, Montana
Ben E. Berg argued, Bozeman, Montana

---

Submitted: March 4, 1975

Decided: APR 29 1975

Filed: APR 2 9 1975

*Thomas J. Kearney*
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a judgment for plaintiffs T.G. Haggerty and F.F. Messmer, co-partners, doing business as Haggerty-Messmer Co., a partnership, in an action for foreclosure of a mechanic's lien against a trailer court owned by defendant Selsco, a Utah corporation qualified to do business in Montana. Action was brought to recover the balance due under a contract to erect certain buildings and install trailer court facilities. Defendant filed a cross-complaint. Trial was held in Gallatin County, Hon. W. W. Lessley presiding without a jury. Judgment for plaintiffs was in the amount of $70,680.55, plus interest at 6 percent or $6,738.85, and attorney fees in the amount of $7,500.

Plaintiffs entered into a contract with defendant for the construction of the West Yellowstone United Campground. The contract was signed on May 28, 1971, and by June 2, 1971, plaintiffs had moved onto the site and begun construction work. Time was of the essence because defendant desired to open the campground in August 1971. Plaintiffs were to construct a road system, water system, auxiliary rest rooms, and finish construction of the main administration building; all work was to be completed in sixty-one calendar days.

Plaintiffs had two general superintendents on the job site during construction. One was in charge of the buildings, the other in charge of the sewer lagoon, site grading throughout the area, and all roads. The engineering firm of Morrison-Maierle designed the project and was responsible for overseeing construction. This firm, from its office in Bozeman, had primary responsibility of checking the project and its resident engineer, Olmstead, was in charge of the general overseeing job.

The first problem that arose was the construction of the main administration building which defendant had contracted to another company, Diamond Homes. While plaintiffs were responsible for building the toilet and shower buildings, they were only responsible for the foundation of the main administration building. Diamond Homes was to erect it and then plaintiffs were to finish off some interior work. The pre-fab Diamond Homes building did not arrive on the site until July 2, 1971. There was no representative of Diamond Homes there to unload it, therefore plaintiffs unloaded the building. Certain materials were unsatisfactory and another eighteen days went by before replacements arrived. In the meantime Diamond Homes made a deal, known to defendant, with plaintiffs to erect the "A" frame building and this work began on July 20, 1971. It is estimated by Bergan, plaintiffs' construction superintendent, that this work took from three weeks to a month. Plaintiffs billed Diamond Homes $3,382.90 for the work. Defendant, knowing of the deal made by Diamond Homes with plaintiffs, paid Diamond Homes for the work but Diamond Homes failed to pay plaintiffs.

Defendant paid plaintiffs all amounts owed, less retainage, through August 20, 1971, but has refused to make any further payments because of alleged defects in the performance of the contract and counterclaims it is entitled to liquidated damages in an amount of $200 per day for a delay of 57 days.

The contract provided that the supervising engineers, Morrison-Maierle, would decide all questions which arose concerning acceptability of materials furnished, work performed, rate of progress of work, interpretation of drawings and specifications, and all questions as to acceptable fulfillment of the contract on the contractor's part. Two major items in the contract appear to have caused the disputes which arose between plaintiffs and defendant--the eighteen shower stalls and the road system.

The specifications called for the installation of commercial grade top quality construction showers, referred to as Sanymetal Shower-master units or their equivalent. The shower stalls installed were not of a commercial grade top quality and this was brought to the attention of plaintiffs before their installation. In addition to the fact the showers were not the kind specified in the contract, the shower bases began cracking because the shower room concrete floor was improperly laid in that it did not slope to the drains. Due to the time factor of getting the camp open, the parties agreed plaintiffs would attempt to fix the showers so they would be equal or equivalent to what the specifications called for. The problem of what it would take to make the units equal or better is one of the disputed issues.

Ronald Olmstead, Morrison-Maierle's supervising engineer charged by the contract to "* * * determine all questions as to acceptable fulfillment of the contract on the part of the contractor" testified: (1) that it would take $300 per shower to bring the installed showers up to acceptable quality; (2) to replace the existing showers with those specified it would cost $10,800; and (3) it would take $1,500 to fix the slope of the floor so it would drain.

A Bozeman master plumber Walter Savage, testified over plaintiffs' objections that to repair and replace the shower stalls at 1972 costs it would cost $11,646 and at 1974 costs $14,886.

Plaintiff Tom Haggerty testified that to grout under all the showers and to fiberglass the eighteen showers would cost from $400 to $800.

The trial court later modified its original findings on the cost to repair and replace the shower stalls from $14,886 to $5,400. Defendant feels this figure inadequate.

The second item in dispute relates to the road system and the award of $1,500 to replace and repair the entrance and exit roads to the campground.

Engineer Ronald Olmstead testified plaintiffs' utility superintendent Elmer Shay primed and surfaced the roads on August 19, 1971, after he was told by Olmstead that "* * * the road bed wasn't quite ready for surfacing yet." After this warning was ignored, Morrison-Maierle absolved itself of responsibility and informed plaintiffs they might have to come back and repair the roads. The entrance and exit roads are each about 1,200 feet in length and connect the compground with the main highway.

Olmstead further testified that, in his opinion, it would cost about $1,000 to repair the exit road; that the entrance road should have a guarantee of one year on it, but that he had not determined what it would take to repair it. He then went on to testify that it would take $7,000 to resurface the entire area. Morrison-Maierle's progress estimate #5 stated, in part:

"The Total Earned of $293,773.95 does not include the prime or seal oil or the crushed cover aggregate for the Exit Road. These have been deducted from the amount due at the bottom of Page 5 since the Exit Road construction is not acceptable to the Engineer or Owner."

From this it appears that any damages arising from the exit road have already been taken out of plaintiffs' contract sums due, but nothing was testified to as to how much the entrance repairs would be, unless the overall figure of $7,000 was used minus the $1,500 finding for the cost to repair the exit road, leaving a figure of $5,500 for repairs to the entrance road.

The campground was opened and functional on September 27, 1971, and according to the supervising engineer's estimate was 99 percent complete.

When the engineer's progress report #4, covering the period from August 20 to November 11, 1971, was submitted for the amount of $49,064.45, defendant refused to pay. When the final progress estimate -- "Estimate No. Five-Final", covering November 11, 1971 to August 20, 1972, was submitted to defendant it declared the project 100 percent complete and directed defendant to pay plaintiffs the further sum of $77,414.35. This has not been paid.

The trial court awarded plaintiffs a judgment in the amount of $70,680.55, plus interest on that amount at six percent per annum to date of judgment or $6,738.85, and the sum of $7,500 attorney fees.

On appeal defendant raises these issues:

1. Was there sufficient evidence to justify the trial court's findings that the sum of $5,400 was necessary to conform the shower stalls to the specifications, and the concomitant issue of what method is to be used to measure the damages incurred when an owner must repair the faulty work of the contractor?

2. Did the evidence justify an award of only $1,500 to replace and repair the exit and entrance roads to the campground?

3. Did the trial court err in finding that defendant was not entitled to liquidated damages for the 57 day delay in the project?

4. Did the trial court's award of $7,500 attorney fees constitute undue hardship in light of the other penalties awarded?

Issue No. 1 questions whether the evidence justified the court's findings as to the showers. All parties to this action recognized that the showers did not meet the specifications. The only question before the trial court was whether the showers could be reinforced and brought up to the contract specifications or whether they would have to be removed and replaced by the showers called for in the specifications.

The evidence indicates that at a meeting attended by the consulting engineers, plaintiffs and defendant's representative, John Konold, it was agreed that plaintiffs would improve the stalls by putting styrofoam sheeting between them to make them rigid and the wall solid. Following that meeting all shower stalls were pulled out, styrofoam sheets were put in, and the stalls replaced. However, the problem of the shower bases had not arisen at that point. As previously noted, there is evidence of three different estimates for damages on the showers: (1) the reasonable cost to repair and provide equal showers; (2) cost of total replacement of showers; and (3) the difference in the cost of installing the specified

shower stalls and the cost of installing the shower stalls that were actually installed. Defendant argues the damages it sustained by plaintiffs' failure to complete the contract according to specifications is computed by the cost of correcting and completing the stalls, not the value which the contractor supplied on the contract to defendant.

Plaintiffs argue this Court has not previously ruled on what is the proper measure of damages for defective construction. However, in Mitchell v. Carlson, 132 Mont. 1, 5, 7, 313 P.2d 717, the Court did consider the damage question in a case involving a homeowner's suit for damages, as a result of a poorly built home. There the Court looked to the statute defining the measure of damages, section 17-301, R.C.M. 1947, which provides:

> "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

The Court in Mitchell in upholding an instruction given which was a verbatim restatement of section 17-301, R.C.M. 1947, said:

> "Applying the statutory rule of damages to this case it is apparent that plaintiffs will be compensated only for the 'detriment proximately caused' by the breach, viz., the cost of making the repairs necessary to complete the house in accordance with the parties' agreement."

In Mitchell the Court cited an Oklahoma case, National Surety Co. v. Board of Education, 62 Okl. 259, 162 P. 1108, where the Oklahoma court interpreted a statute similar to that of Montana and arrived at the same basis for damages. Also in Mitchell the Court quoted from Montgomery v. Karavas, 45 N.M. 287, 114 P.2d 776,781:

> "'Where the contractor fails to keep his agreement, the measure of the employer's [owner's] damages, whether sought in an independent action or by recoupment or counterclaim, is always the sum which will put him in as good a position as if the contract had been performed. If the defect is remedial from a practical standpoint, recovery generally will be based on the market price of completing or correcting the performance, and this will generally be shown by the cost of getting work done or completed by another person. * * * 5 Williston on Contracts, Sec. 1362.'" (Emphasis supplied).

Plaintiffs argue that the Court so held in Mitchell because it was faced with a fact situation that required tearing down construction already in place, inferring that such an application of the rule should apply in the instant case. Such an application cannot be given to the facts here for, by both contract and stipulation, the parties agreed to accept the supervising engineer's decision on all questions as to acceptable fulfillment of the contract by the contractor. Here, we have opinions as to the cost of redoing the showers and their bases to bring them within the contract standards. Those opinion figures varied from $300 per shower by the supervising engineer, to the cost for total replacement of $14,886. The trial court found the $300 per shower figure or a total of $5,400 would remedy the shower situation. We find no error on the part of the trial court.

Defendant's issue 2 questions the award of $1,500 to replace and repair the exit and entrance roads. Both parties argue the court was in error in settling on the figure of $1,500. Defendant alleges the figure is arbitrary. Plaintiffs allege (1) there is nothing in the record to support an award in excess of $1,000 and, (2) because the engineering firm, in preparing the final progress report, deducted $640 from the contract price as a result of the unsatisfactory exit road, that no damages should be awarded for the repair of the exit road. Not so! Olmstead testified there was a one year warranty on the road; that it was improperly sealed and coated; and, that plaintiffs were warned the road might have to be redone. He further testified the exit road would need resurfacing and estimated the exit road would cost about $1,000 to resurface and the entire area would cost about $7,000 to resurface. Although Olmstead could not say whether the entrance road needed resurfacing at that time, John Konold testified to the deterioration of both the entrance and exit roads. While the record does not reveal why the district court decided to award the sum of $1,500 for the repair of the roads, it was within the range of the evidence

offered. The fact that $640 was deducted from the contract price would merely result in an offset from any damages suffered by defendant. It would not preclude it from damages. We find no error.

Defendant's issue 3 questions the trial court's denial of liquidated damages to defendant for the 57 day delay.

The contract provided for liquidated damages at the rate of $100 per day for general construction; $100 per day for the building contract. The trial court found the delay, if any, was contributed to by defendant or waived by defendant. We agree. B & L Painting Co., Inc. v. United Pacific Ins. Co., ____Mont.____, 527 P.2d 554, 31 St.Rep. 868.

Here, the contractee caused a substantial part of the delay in the building and in the progress of the work. Without any agreement for an extension of time to offset the delay, the time fixed in the contract and any provisions for liquidated damages based thereon are abrogated leaving the contractor responsible only to complete the work within a reasonable time. B & L Painting Co., Inc. v. United Pacific Ins. Co., supra; Anno. 152 A.L.R. 1349, 1359; Figgins v. Stevenson, 163 Mont. 425, 517 P.2d 735, 30 St.Rep. 1201.

We note here, for correction by the trial court, that an error was made in estimating interest due. The contract, Section 7.06, provides:

"INTEREST ON UNPAID PROGRESS ESTIMATES: Should the Owner fail to pay a Progress Estimate within thirty (30) days from the date of the preparation by the Engineer, and should he fail to inform the Engineer and the Contractor in writing of his reasons for withholding payment, the Owner shall pay the Contractor interest on the amount of the Progress Estimate at the rate of six per cent (6%) per annum until payment is made."

Progress estimate No. 4 covering the period of August 20 to November 11, 1971, directed the owner (defendant) to pay $49,064.45. It has never been paid. The trial court failed to compute interest from November 11, 1971 to the date of filing the complaint on September 8, 1972. An additional sum of $2,605.12 is due and owing. Clifton, Applegate & Toole v. Big Lake Drain

- 9 -

Dist. No. 1, 82 Mont. 312, 267 P. 207.

Further, the judgment should be increased $350 for the cost of a water valve, allowed by the trial court in its finding of fact No. 21. While not provided for in the specifications, it was put in by agreement of the parties and the contractor should be reimbursed.

Defendant's issue 4 concerns the payment of attorney fees. The trial court awarded plaintiffs $7,500 for attorney fees and defendant objects to the amount, alleging it was wrongfully awarded. We find no error. A senior member of the Gallatin County Bar testified that fees for such a case should be from $15,000 to $27,000. The trial court's figure of $7,500, or approximately ten percent, is most certainly proper in view of the problems which arose. An additional fee for this appeal is allowed in the amount of $1,000.

The cause is remanded to the district court for entry of judgment in accordance herewith.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices.

Mr. Justice Gene B. Daly concurring in part and dissenting in part:

I concur generally with the majority opinion but cannot agree with the damage award discussed under issue 2 to replace and repair the exit and entrance roadways. The contractor surfaced the roadway after being warned by the engineer in charge that it was not ready for surfacing. The contractor was informed he might have to come back and repair the road. The full burden of this road rests on the road contractor under these circumstances.

The deduction on estimate #5 made by the engineers for seal oil and cover aggregate is not significant as it pertains to reconstruction of the road and does not cover that damage figure due the owner for the exit portion, much less the entrance. There is testimony that both exit and entrance roads need attention due to deterioration and the entire job would cost $7,000. Under the circumstances the $1,500 award is error.

_____
Justice.