SAN ORE–GARDNER, Plaintiff,

v.

MISSOURI PACIFIC RAILROAD
COMPANY, Defendant,

v.

TRAVELERS INDEMNITY COMPANY,
Third–Party Defendant.

No. LR–73–C–123.

United States District Court,
E. D. Arkansas, W. D.

June 27, 1980.

Ronald May, Little Rock, Ark., and Thomas M. Phillips, Houston, Tex., for plaintiff and third–party defendant.

Bill S. Clark, Little Rock, Ark., for defendant Mo. Pac RR Co.

## MEMORANDUM OPINION

ROY, District Judge.

Some background information may be helpful in understanding the issues involved in this cause of action. Under the authority of Public Law 525, 79th Congress, July 24, 1946, 60 Stat. 634, the Government undertook the development of a multiple–purpose

project known as the Arkansas River Project to improve the navigability of the Arkansas and White Rivers.

At all times material herein, the Missouri Pacific Railroad Company (Missouri Pacific or the Railroad) has been the owner and operator of a railroad bridge across the White River near Benzal, Arkansas, known as the Missouri Pacific Railroad Benzal Bridge. The Government, believing it to be necessary for the completion of the aforesaid project, entered into a contract with Missouri Pacific to rearrange and alter the Benzal Bridge on June 19, 1967. ("Government–Missouri Pacific Contract," Pl. Ex. 5). The Government entered into similar contracts with four different railroads as a part of the Arkansas River Project, including two other contracts with Missouri Pacific relating to bridges known as the Baring Cross Bridge and the Junction Bridge.

The Government–Missouri Pacific Contract was subtitled "Cost Reimbursable," meaning that the Government was obligated to reimburse "all reasonable and legitimate costs" incurred by the Railroad in arranging and altering the Benzal Bridge. The Government–Missouri Pacific Contract provided in substance that the Railroad would invite bids from construction contractors for the alteration of the Benzal Bridge pursuant to plans and specifications approved by the Government. For assistance in devising the plans and specifications, the Government entered into a contract with Sverdrup & Parcel and Associates, Inc., a consulting engineering firm. Subsequently, Missouri Pacific also contracted with Sverdrup & Parcel to provide engineering services during the performance of the alterations. After the Government approved the plans and specifications, Missouri Pacific issued invitations to twenty–eight contractors. Bids were let on August 28, 1968, with only two bids submitted. San Ore–Gardner (S.O.G.) was the low bidder with a bid of $4,837,586.00, as compared to a bid of $5,436,365.00 from the other contractor.

Both of these bids were considerably in excess of the $3,657,402.00 estimated by Sverdrup & Parcel. Sverdrup & Parcel later conceded that its estimate was too low, and that the higher bids were justified due to factors such as the high risk, low productivity and the remote and inaccessible site of the work.

S.O.G.'s bid was accordingly accepted, and Missouri Pacific entered into a contract with S.O.G. with regard to the work on November 5, 1968. ("Missouri Pacific–S.O.G. Contract," Pl. Ex. 6).

After difficulties arose between the parties, this action was filed by plaintiff, S.O.G., against Missouri Pacific, defendant. The Court has jurisdiction of this suit by virtue of 28 U.S.C.A. §§ 1332 and 2201, and venue pursuant to 28 U.S.C.A. § 1391. S.O.G.'s amended and substituted complaint was filed January 8, 1975. In response to S.O.G.'s Amended and Substituted Complaint, Missouri Pacific moved to dismiss the case for lack of joinder of an allegedly indispensible party, the United States of America ("the Government"), acting through the Corps of Engineers, and alternatively to require plaintiff to make the Government a party to the suit. This Motion was overruled on September 9, 1975. Thereafter, and as a result of a pretrial conference herein on January 27, 1977, Missouri Pacific filed a Third Party Complaint against the Government and Travelers Indemnity Company, surety for S.O.G., on February 17, 1977.

By way of response, the Government moved to dismiss the Third Party Complaint on the grounds that this Court lacks subject matter jurisdiction and that, in any event, Missouri Pacific has failed to exhaust its administrative remedies. The Motion was granted dismissing the Government on March 3, 1980.[1, 2]

At a pretrial hearing the Court ordered a bifurcated trial of this cause, first as to the issues of liability and thereafter as to the

1. Travelers Indemnity Company, Third Party Defendant, remains a party to this action.

2. This case, at different times, had previously been assigned to five other judges before being assigned to Judge Roy in March of 1979.

amount of damages or adjustment if the parties were unable to agree thereon. The trial commenced on April 14, 1980 continuing through April 18, 1980. Excellent briefs have been submitted by the parties and the cause is now ready for determination on the issue of liability.

From the very beginning this construction project was fraught with many problems. Some of these problems were created by the parties' own actions or inactions, and other problems by circumstances over which none of the parties had any control.

After reviewing the evidence adduced at the week–long trial, and also considering the many exhibits [3] introduced, the court has reached the conclusion that both sides were at fault to some extent.

The plaintiff's main contentions are as follows:

The exchange of letters between Missouri Pacific and S.O.G. of June 13, 1969 and July 14, 1969 constituted a new written agreement between the parties, as provided for in Paragraph 49 of the Missouri Pacific–S. O.G. Contract; an implied term of the written agreement was that S.O.G. would recover all its increased costs as a result of the funding delay.

Plaintiff contends, alternatively, that if no new letter agreement was made between the parties, Missouri Pacific breached Paragraph 49 of the Missouri Pacific–S.O.G. Contract by failing to suspend the work upon learning of the lack of funding and consequently the Railroad is liable in damages for the increased costs incurred by reason of the breach.

Next plaintiff alleges that the imposition of a seasonal restriction on changeover and immobilization of the span by the Government after S.O.G. had entered into the Missouri Pacific–S.O.G. Contract constituted a material breach of the owner's implied obligation not to hinder or delay performance. In this connection it is contended that both the Government and the Railroad failed to

disclose to S.O.G. material information which would have affected S.O.G.'s position, i. e., receiving approval of the Coast Guard for a permit, the seasonal limitation on changeover, and immobilization of the span.

S.O.G. also claims damages because the Railroad allegedly breached its implied obligation not to hinder or delay S.O.G.'s performance by failing to timely apprise the Government of S.O.G.'s float–in and erection plans.

Finally plaintiff contends that the liquidated damage clause of the Missouri Pacific–S.O.G. Contract is unenforceable and S.O.G. is entitled to the return of all moneys withheld by the Railroad as liquidated damage and to all moneys withheld by the Railroad on account of noise in the bearings.

The Railroad vigorously denies that any of plaintiff's contentions have merit. The defendant Railroad specifically contends that under the terms of the contract between S.O.G. and Missouri Pacific the plaintiff is not entitled to any increased cost for delays at any stage of the construction. It contends further it did not breach the contract and that all delays were caused by the plaintiff's own inefficient planning and dilatory manner of carrying out each phase of the construction operations. The Railroad also contends that under the provisions of the contract it is entitled to $600.00 per day liquidated damages for each day construction continued past the time allowed by the contract for completion of the project, i. e., March 6, 1972.

The Missouri Pacific–S.O.G. Contract contemplated an ordinary sequence of work by S.O.G. through various stages, commonly referred to as Stage I, Stage II and Stage III. In Stage I (Substructure Construction), S.O.G. was to erect two new piers on which the new lift span was to be placed. In Stage II (Changeover or Changeout), S.O.G. was to remove the existing swing span of the railroad bridge and change over to a new lift span to be seated upon the

---

**3.** The plaintiff introduced 99 exhibits and the defendant 87 exhibits. (A few were later withdrawn because they were duplicative.)

new piers. In Stage III (Superstructure Construction), S.O.G. was to complete the work on the new lift span, commonly referred to as the superstructure of the bridge, and remove the old central pier on which the swing span had rotated.

█ The Court will first discuss S.O.G.'s contentions concerning the allowance of increased costs for the funding delay. On February 7, 1969 Missouri Pacific gave S.O.G. notice by telegram of authority to proceed with the work. S.O.G. began planning for the work under the assumption that funds would be available but the funding did not become available immediately. It is the contention of S.O.G. that Missouri Pacific became aware of the fact that the Government might not immediately fund the Benzal Bridge Project and did not promptly give it notice to suspend the work under the terms of the contract. By letter of April 2, 1969, E. T. Franzen, Chief Engineer of the Railroad ("Franzen"), stated his concern over this prospect to Col. Charles L. Steel the Government's Contracting Officer, saying, in part:

If additional funds cannot be obtained for the Benzal Bridge, we should immediately notify S.O.G. not to start any work at this bridge site prior to the beginning of the next fiscal year or at such time as we know that the government has funds available for reimbursement of our billings.

Missouri Pacific also asked the Government to give it official written notice of the unavailability of funds pursuant to the Government–Missouri Pacific Contract. (Pl. Ex. 12)

Colonel Steel acknowledged receipt of the letter April 11, 1969, writing Missouri Pacific as follows:

Your concern over the status of funds is understandable and we are pleased to assist you in continuing work on these features of the Arkansas Navigation Project.

Thereafter S.O.G. did not do any actual work on site but entered into several contracts with subcontractors preparatory to construction work. On June 10th representatives of Missouri Pacific and Sverdrup and Parcel met with representatives of the Government, including Col. Steel, at which meeting it was indicated sufficient funds would not be immediately available for the alteration of the Benzal Bridge.

Article 2.b(5) of the Government–Missouri Pacific Contract provided in part as follows:

*Should it become apparent to the Contracting Officer that the available funds will be exhausted before additional funds can be made available, the Contracting Officer will give at least 30 days written notice to the Owner that the work may be suspended.* If the Owner so elects, after receipt of such notice, it may continue work under the conditions and restrictions under the specifications, so long as there are funds for inspection and superintendence with the understanding, however, that no payment will be made for such work unless additional funds shall become available in sufficient amount. When funds again become available, the Owner will be notified accordingly. *Should work be thus suspended, additional time for completion will be allowed equal to the period during which work is necessarily so suspended, as determined by the dates specified in the above-mentioned notices.* [emphasis supplied]

Paragraph 49 of Section 1 of the Specifications for Bridge Construction in the Missouri Pacific–S.O.G. Contract provided as follows:

## FUNDS AVAILABLE FOR PAYMENT

The Company [Missouri Pacific] will make partial payments based on the monthly and the final estimates upon the release of funds by the U.S. Government to the Company covering payment of said estimates, said release of funds by the U.S. Government being subject to the provisions of contracts between the United States of America and the Missouri Pacific Railroad Company which in essence are as follows:

Funds in specified amounts are available for work to be performed by the Company during the current fiscal year which ends on 30 June 1968 from funds heretofore appropriated by the Civil Works Appropriation Act of 1966 for the performance of work and other obligations under these contracts. Funds for completion of all work provided for herein are not available from present appropriations and payment therefor is dependent upon future appropriations or allotments.

It is expected that, during the subsequent fiscal year or years over the period of this Contract, Congress will make additional appropriations for expenditures on work under this Contract. The Government will notify the Company of any additional allocation of funds to this Contract when such funds become available.

*Should it become apparent to the Government that the available funds will be exhausted before additional funds can be made available, the Government will give at least 30 days' written notice to the Company that the work may be suspended.* If the Company so elects, after receipt of such notice, it may continue the work in accordance with the approved Plans and Contract Documents with the understanding, however, that no payment will be made for such work unless additional funds shall become available in sufficient amounts. When funds again become available the Company will be notified accordingly.

*Should Congress fail to provide additional funds, the Company may suspend work without prejudice to it or liability to the Government. However, if the funds cited in the contracts are enough to extend the work beyond the end of the fiscal year, and no new funds are allocated to these contracts for the ensuing fiscal year, the Company must, if feasible, first exhaust all the cited funds and thereafter it may, at its option, suspend the work provided herein until funds are again available.*

Any progress chart initially submitted for approval which contemplates progress at a greater rate than can be paid for with currently available funds will be approved only under the condition that such approval will in no way obligate the Government to make additional funds available for the work. The approval of that part of the schedule covering work for which funds are not currently available will in no way obligate the Government to provide funds to accomplish work at the rate of progress indicated in the schedule. [emphasis supplied]

*It is understood and agreed that, notwithstanding anything to the contrary that may be contained elsewhere in this agreement, neither the Government nor the Company guarantees the availability of funds; nor will either thereof be obligated to provide funds in those instances where the Contractor submits, as aforementioned, a progress chart or schedule contemplating progress at a greater rate than can be paid for with currently available Government funds, it being understood by the Parties hereto that the Company is to be paid by the Government for all costs accruing under this Contract.*

*It is understood that the Company will suspend the work at the earliest date permissible under the above provisions except as may be otherwise mutually agreed in writing between the Company and the Contractor.* [emphasis supplied]

(Pl. Ex. 6)

Colonel Steel, at the June 10, 1969 meeting, advised S.O.G. that funds were not available without giving notice of suspension of the work. If the work were suspended, S.O.G. was entitled to certain rights pursuant to the Contract. These rights are set forth in Paragraph 35 of Section 1 of the Specifications for Bridge Construction which provides as follows:

The Company [Missouri Pacific] may at any time stop the work, or any part thereof, by giving ten days' notice to the Contractor [S.O.G.] in writing. The work shall be resumed by the Contractor within ten (10) days after the date fixed in the written notice from the Company to the Contractor so to do. The Company

shall not be held liable for any damages or anticipated profits on account of the work being stopped, or for any work done during the interval of suspension. It will, however, pay the Contractor for expense of men and equipment necessarily retained during the interval of suspension, provided the Contractor can show that it was not reasonable practicable to move these men and equipment to the other points at which they could have been employed. The Company will further pay the Contractor for time necessarily lost during such suspension at the rate of ten (10) percent per annum on the estimated value of materials, equipment and fixtures furnished by the Contractor on the work which are necessarily idle during such suspension, said rate of ten (10) percent per annum being understood to include depreciation, interest and insurance, but if the work, or any part thereof, shall be stopped by the notice in writing aforesaid, and if the Company does not give notice in writing to the Contractor to resume work at a date within thirty (30) days of the date fixed in the written notice to suspend, then the Contractor may abandon that portion of the work so suspended and he will be entitled to the estimates and payments for work done, on such portion so abandoned, as provided in the Article entitled "Final Estimate" [Paragraph 66 of Section 1 of the Specifications for Bridge Construction] of this Contract.

The Railroad did not formally suspend the work under paragraphs 35 and 49 of the S.O.G. Contract, but wrote S.O.G. on June 13, 1969:

Your attention is directed to paragraph 49 on pages 1–20 and 1–21 of the Specifications for the Alterations to Benzal Bridge No. 3778 and the provision in it that neither the Government nor the Company [MOPAC] guarantee the availability of funds. In view of Colonel Steel's opinion as to the availability of funds for the fiscal year 1970, we believe you should be given the opportunity to elect to suspend the work as contemplated by paragraph 49 of the Specification, and it is our thought that it would be advisable for you to defer starting any substructure work until such time as we have notification from the Corps of Engineers that funds will be available for progressing the work.

This letter constituted an invitation to S.O.G. to suspend the work if it desired to do so.

Also, along these same lines a letter dated September 25, 1969 to S.O.G. from Missouri Pacific stated, in part:

Your attention is again directed to Paragraph 49 on Pages 1–20 and 1–21 of the Specifications for the Alterations to Benzal Bridge No. 3778 and the provision in it that neither the Government nor the Company [MOPAC] guarantee the availability of funds.

S.O.G. contends that the letter of June 13, 1969 from Franzen constitutes an invitation to S.O.G. to enter into a second or amended contract because in response to that letter, S.O.G. wrote as follows:

In view of the information you have furnished and the recommendation you have made in your letter of June 13, 1969; we see no prudent course other than to suspend starting of substructure work on reference project until availability of funds is clarified.

A number of problems occur as a natural outgrowth of this move. However, with the continuing review and variation of fiscal policy reported at the Federal Government level we are unable to plan solutions at this time. As soon as some degree of stability in fiscal planning is achieved, we will want to discuss with you the problems, solutions and possible cost saving moves that might be undertaken.

However, these letters did not deal with the question of additional costs nor even mention them. It is true none of the parties knew how long the work would be delayed or what the monetary consequence would be at that time. However, the Court notes that no reservation of rights was retained and plaintiff should have made more

affirmative demands or expressly stated that the delay in funding required a new written agreement of the parties. It is also very questionable whether S.O.G. was in any position to begin the work prior to the additional funding. Shortly after receiving the notice to proceed, S.O.G. asked permission to change the specifications and to redesign the method of construction of the piers. Before proceeding it was necessary to get Government approval of S.O.G.'s proposed cofferdam method of construction. Some modifications were made in the design and final approval was not forthcoming until June 24, 1970.

In January of 1971 the parties entered into Change Order No. 6 and it reads as follows:

### CHANGE ORDER NO. 6

To contract between Missouri Pacific Railroad Company and San Ore–Gardner Construction Company.

FOR:

Alterations to Benzal Bridge No. 3778 over the White River near Benzal, Arkansas

1. This change order provides for an extension of contract time pursuant to Article 41, Unavoidable Delays: Extension of Time on Parts of Work, General Provisions of the Contract.

2. In accordance with the provisions of Article 49, Funds Available for Payment, General Provisions of the Contract, the Contractor, by mutual agreement with the Company, elected to suspend the work as the funds allocated by the Government were insufficient for reimbursement of site work at the anticipated rate of progress.

3. The contract time for completion of all work as set out in Article 10, Section 3, is hereby extended 462 calendar days. The original contract allowed 660 calendar days for completion of all work; this extension increases the total contract time to 1122 calendar days from receipt of Notice to Proceed, February 8, 1969, and establishes March 5, 1972, as the current contract completion date.

4. There is no increase or decrease in the contract price resulting from this change order.

5. No other conditions of the contract are altered pursuant to this change order.

The Order was signed for S.O.G. on January 17, 1971 and for Missouri Pacific on January 22, 1971. The parties are bound by this agreement notwithstanding S.O.G.'s arguments to the contrary.

S.O.G. also contends that if the Court does not find that a new contract was created, alternatively Missouri Pacific breached the written contract and S.O.G. is entitled to recover damages for the breach. The Court does not find that Missouri Pacific breached the written contract. It is true that Missouri Pacific did not at all times act as promptly as it should in transmitting information it received from the Government to S.O.G. It would have certainly been desirable to have had prompt action and complete cooperation between the parties. However, Missouri Pacific did notify S.O.G. on June 13th of the shortage of funds and gave S.O.G. the option of electing to suspend the work pursuant to the specifications. Thereafter, by "mutual agreement" the parties entered into Change Order No. 6 which specifically provided 462 additional days time for the delay caused by lack of funding. The Court finds Change Order No. 6 specifically states "no increase or decrease in the contract price."

■ Further, the Court finds some merit in Missouri Pacific's contention that it could not suspend the work in the sense S.O.G. argues. In June 1969, $148,000.00 allocated for the project was still available. According to the unofficial report of the Corps, a total of $1,000,000.00 was being made available for fiscal year 1970. Paragraph 49 of the parties' Contract states in part:

Should Congress fail to provide additional funds, the Company may suspend work without prejudice to it or liability to the Government. However, if the funds cited in the contracts are enough to extend the work beyond the end of the fiscal year, and no new funds are allocated to

these contracts for the ensuing fiscal year, the *Company must*, if feasible, *first exhaust all the cited funds and thereafter it may, at its option, suspend the work provided herein until funds are again available.* [emphasis supplied]

With S.O.G. doing no actual construction work, $148,000.00 on June 12, 1969 was sufficient to extend the "no work" beyond June 30, 1969, the end of the fiscal year. A total allocation of $1,000,000.00 for fiscal year 1970 would not constitute "no new funds" within the meaning of Paragraph 49 of the Contract.

Plaintiff's next claim regarding damages is in connection with the change-over delays. It is the contention of the plaintiff that a major portion of the problems arose because of a lack of communication of the parties concerning the securing of a permit for the changeover. S.O.G. contends that at the time the contract was let it assumed that all necessary permits had been secured from the United States Coast Guard. The Court's attention is directed to Paragraph 6 of the Special Conditions of the Missouri Pacific–S.O.G. contract which stated:

Construction of a bridge over the navigable waters of the White River near Benzal, Arkansas has been authorized by an instrument of approval of location and plans therefor, signed by the Commandant, U.S. Coast Guard.

S.O.G. interpreted this to mean that all the necessary permits had been obtained.

Prior to the letting of the project, however, the Railroad knew that an additional Coast Guard permit would have to be secured to perform changeover and immobilize the span. On August 22, 1968 the Coast Guard wrote the Railroad as follows:

[D]uring the period of alteration, we take the position that the regulation can remain substantially unchanged until the 9–month period when the float–out and float–in process of the draw span is in progress. At that time it will be necessary to change the regulation to obviate the opening of the span until the new life span is operable.

However, the defendant called the Court's attention to Paragraph 18 of the General Provisions, page 1–7 of the parties' contract which provides in part:

The Contractor shall, at his own expense obtain all permits required for the performance of work, and he must strictly comply with all laws and ordinances which may apply to the work.

Paragraph 6 of the Special Conditions, page 2–3 of the parties' contract, provides in part:

All work in navigable waters shall be so conducted that free navigation of the waterway will not be unreasonably interfered with and that existing navigable depths will not be impaired.

The Contractors shall *communicate* with the appropriate agency or agencies and *procure*, at his own expense, *all required permits*. The Contractor shall comply fully and faithfully with the requirements established by the District Engineer, Corps of Engineers and the U.S. Coast Guard, and such other agencies, if any, as may have jurisdiction. Copies of all permits and authorization shall be filed with the Engineer for information and record.

These two paragraphs make it clear that it was S.O.G.'s primary duty to obtain the permit for changeover as well as for cofferdam work on any phase of construction that might impair navigation.

The correspondence indicates that S.O.G. understood, or should have understood, that under its contract with Missouri Pacific the duty to communicate with the Coast Guard and the Corps of Engineers to obtain the necessary permits was imposed upon it. S.O.G. did let the Coast Guard have its proposed high water changeover plan for the 1972 season and except for S.O.G.'s own admitted delay of one year in the Stage I pier construction the changeover could have been accomplished much sooner. When S.O.G. initially planned for the installation of the lift operation, plaintiff was aware of the fact that the Coast Guard's permission had to be obtained for this phase. On

March 29, 1971 Missouri Pacific advised S.O.G. that the November date presented serious problems because this was a period of high water and permission would be difficult to obtain.

The fact that in some instances Missouri Pacific also was contacting the appropriate authorities endeavoring to secure the appropriate permits does not make it primarily responsible for the securing of them or the delay.

S.O.G.'s March 1, 1972 schedule showed changeover taking place on November 15, 1972 so that the span would be immobilized during the high water season.

Nashville Bridge Company was S.O.G.'s subcontractor for the steel work, including the entire superstructure. S.O.G., foreseeing no further delays, gave instruction to Nashville Bridge to begin the preliminary work. However, difficulties arose with securing a permit from the Coast Guard and S.O.G. was also running behind in its schedule. These problems resulted in Nashville Bridge Company's abandoning the job and disclaiming all responsibility in connection with it. S.O.G. attributes delays caused by termination of the subcontractor to lack of cooperation on the part of Missouri Pacific and seeks damages from it.

■ However, Defendant's Exhibit No. 41 indicates pictorially S.O.G.'s schedules and then revised schedules which were necessitated because completion dates could not be met by the plaintiff. On February 25, 1972, after a meeting on February 3, 1972, Nashville Bridge wrote S.O.G. a letter and stated:

Enclosed is a general schedule for our work and that work to be coordinated by us on the Benzal project.

This schedule is based on a work week basis. Based on the information we received from you at the site on February 17, 1972, week # 21 is the week of September 15, 1972.

We are proceeding with the engineering and construction of falsework. I point out that we will reach a point of "no return" at which we will have committed for barges, falsework and equipment. If we are unable to float–in on or about September 15, 1972, due to non–availability of piers, the costs incurred by such delays will have to be for your account. We will prepare a detailed schedule in coordination with the electrical sub–contractor and our other sub–contractors. A copy will be forwarded to you.

The evidence shows that S.O.G. did not complete the piers until November 1972 and did not meet any of its previous schedules. The evidence also shows that the delays were in construction work. S.O.G. admitted to a year's delay in completing the Stage I pier work. Consequently the Court cannot hold Missouri Pacific responsible for these delays.

■ S.O.G. also claims increased costs because of interference by Missouri Pacific with float–in and erection procedures. On February 1, 1973, two months after receiving S.O.G.'s float–in and erection scheme, the Railroad wrote S.O.G. as follows:

We are continuing our review of your scheme for assembling the new truss drawspan for the subject bridge on the transporter barges and floating the system down river to the erection site at Benzal, Ark.

While the erection stresses and the truss span appear at this time to be satisfactory, both our Consultants and the Corps of Engineers have expressed concern about the stability of the system under the Dynamic Loading switch would be encountered during assembly and travel. I am quite sure you realize that the consequences of a failure of the transporter system due to inadequacy of equipment or instability of arrangement would be most serious.

We do not feel it is our province to inspect or evaluate the adequacy or arrangement of the Contractor's equipment. However, in view of the Corps' expressed concern it is strongly recommended that the float–in equipment as modified to support the truss and its arrangement for assembly and travel be reviewed by a naval architect and certifi-

cation obtained as to adequacy for the proposed scheme.

S.O.G. did not reply promptly, but after waiting more than a month, on March 7, 1973 wrote to the Railroad saying, in part:

[Y]our "expressed concern about the stability of the system under Dynamic Loadings" is neither helpful nor constructive. Surely you must realize that your letter is so vague and intangible as to leave us in the position of conjecture as to what you may have in mind. If you know of any specific defects or suspect the existence of defects, which any sound engineering review would discover, we consider it your obligation to so inform us. If on the other hand, you have no specific recommendations or comments to offer, we likewise consider it your obligation to so inform us so that henceforth the record will be clear.

S.O.G. also forwarded the report of Schuller & Allan, Inc., naval architects, dated February 15, 1973, regarding the stability of the system. A copy of this report was sent to Sverdrup & Parcel.

The Railroad replied to this letter on March 14, 1973, stating to S.O.G. in part:

We are glad to be advised that you have been assured by your consulting naval architects that all is satisfactory. Receipt is acknowledged of copy of your consultant's report, dated February 15, 1973, for our files.

However, after this correspondence ensued between the parties, the Corps of Engineers expressed dissatisfaction with aspects of the plans for floating the span downstream. Several meetings were then held among the various interested parties, at which the Coast Guard imposed various additional requirements on S.O.G. At one such meeting on June 21, 1973, the Railroad advised that S.O.G. would not be able to effect changeover until at least July 21, 1973 because the Missouri Pacific–S.O.G. contract required that S.O.G. give the Railroad thirty days' advance notice in writing of the proposed changeover date.

Then it developed the Corps of Engineers and the Coast Guard determined the water was too high for the float–in on the date projected. After a number of further meetings and the additional exchange of correspondence between all parties, changeover was effected during the 24–hour period beginning at 6:00 a. m., August 11, 1973.

The Court finds that with respect to the float–in procedures, that S.O.G. selected a site to perform the erection and float–in of the span which was located a considerable distance from the Benzal Bridge site. Therefore, the float–in required S.O.G. to comply with the rules and regulations of the U.S. Coast Guard, the Corps of Engineers and the Waterways Commission. The changes and interferences with S.O.G.'s planned procedures resulted from activities outside of the contract documents and were of the nature that would apply to any construction company finding it necessary to transport large structures of this nature on a navigable stream. For these reasons the Court finds that Missouri Pacific was not primarily at fault in connection with S.O.G.'s erection and float–in procedures.

This does not mean that Missouri Pacific is without fault. No satisfactory explanation has been given for its failure to promptly transmit the naval architect's report to the Corps of Engineers. However, this delay was so interwoven with the delays for which plaintiff was responsible, and those caused by other parties, that the Court does not find it of such material consequence as to indicate plaintiff has carried the burden of proof as is necessary to recover for increased costs.

The delays and defects in S.O.G.'s construction work about which Missouri Pacific complained are clearly reflected in the record. For purposes of this opinion the Court will highlight only a few. On June 3, 1971 Missouri Pacific notified S.O.G. that its emergency power system was performing poorly; that S.O.G. had been directed to install a more reliable system; that S.O.G. had failed to do so and additional power failures had occurred; that S.O.G. take immediate steps to correct the problems. On July 20, 1971 Missouri Pacific notified S.O.G. that as a result of continued move-

ment of existing Piers 2 and 3, Missouri Pacific has had difficulties in keeping the existing swing span operable. Missouri Pacific listed the work which was performed by its crews in making the necessary repairs to keep the piers stable and advised S.O.G. that such work and repairs were caused by plaintiff's failures.

On July 26, 1971 Sverdrup & Parcel notified S.O.G. that due to extremely poor performance of the concrete batch plant, Missouri Pacific would not allow further concrete placement until modifications of the equipment were made.

Construction of the east cofferdam took six months, whereas only three months were available to complete by January, the scheduled date for completion. Each pier dewatering took eight months. It should have been completed in less than half this period of time.

On April 12, 1972 Sverdrup & Parcel notified S.O.G. that its dewatering procedure for Cell No. 4 was not in accord with the plan and design submitted; that sand fill had subsided about 15 feet and the only action taken has been to add stone to replace discharged sand. Missouri Pacific advised S.O.G. on May 9, 1972 that its March 6, 1972 schedule was now unsatisfactory. Missouri Pacific pointed out that as of May 9, 1972 S.O.G. was approximately seven months behind the schedule submitted June 1, 1971.

A review and analysis of the work progress of S.O.G. was made by Sverdrup and Parcel on May 31, 1972. The written report, in part, reflects the following:

(a) Fifty percent complete with installation of inner cofferdam sheet piling. Should have been completed the third week in May according to S.O.G.'s schedule.

(b) Direct effect of not completing the cofferdam is to delay excavation and placing concrete for the base, which in turn delays completion of the filling of pier protection cells.

(c) Schedule shows mobilization for structural steel beginning middle of May. Has not started. Mounting of grillages on barges scheduled for last week in June. Do not know if S.O.G. plans to go ahead with these items because we do not have anything resembling a revised schedule from the superintendent on the job.

(d) Delays in completing pier and cap concrete affects other work. No significant improvement in west cofferdam work based upon contractor's statement that east cofferdam afforded experience that would reduce time on this cofferdam.

(e) Estimate that instead of change–out date in November 1972, this operation cannot be accomplished until January or February 1973.

Although S.O.G., as reflected by the schedules and revised schedules, was aware that the project was running far behind projections, the work force was not increased until almost the end of the job. A project of this magnitude needs careful and continuous supervision. Yet, no *full time* supervisor was ever placed in charge to coordinate the work and keep it moving ahead on time.

As to the issues of Liquidated Damages and Retainage, the Government–Missouri Pacific Contract had no provision for the collection of liquidated damages from the Railroad if work on the bridge was delayed beyond the contract period.

■ However, the Missouri Pacific–S.O.G. contract contained a provision for liquidated damages. It provided as follows:

It is further agreed that if this contract is not completed within the time allowed, the undersigned [S.O.G.] agrees to pay as liquidated damages for the Company's [Missouri Pacific's] increased *engineering, administrative and operating costs*, and not as a penalty, the amount   .   .   . [of $600.00] for each calendar day in excess thereof. (emphasis added)

The record reflects this liquidated damages clause was not the subject of negotiation between the Railroad and S.O.G. It does not appear to be a bona fide attempt by *both* contracting parties to agree in advance on a reasonable forecast of just compensation for any harm which would be

caused by delayed performance on the part of S.O.G.

The Railroad has not given any rational basis for its choice of $600.00 per day as damages for delay. The Railroad was already protected against all increased engineering, administrative and operating costs by provisions in the Government Contract.

In fixing the $600.00 per day amount, Missouri Pacific did not attempt to estimate any additional administrative or operating costs which would result in such delays. It gave consideration only to the possibility of shippers' claims which might accrue if the work were delayed.

Furthermore, shippers' claims cannot fairly be interpreted as "engineering, administrative and operating costs" against which the Railroad purportedly sought protection. Shippers' claims would bear no reasonable relationship to the $600.00 a day figure. However, the evidence indicated the Railroad sustained no shippers' losses and no claims were made against it for losses because of the delays in the alterations of the Benzal Bridge.

The Railroad has contended that this case should be governed by Missouri law, under which the claim for liquidated damages would be permissible. The Court notes that the performance of the contract took place in Arkansas and since this was a construction contract, Arkansas had a much more significant relationship with the contract than did the State of Missouri. However, regardless of which state law controls the issue, the Court finds the clause was in the nature of a penalty instead of liquidated damages and not enforceable. The Court is convinced by the testimony adduced at trial that there was not any realistic consideration given to the elements of damage which could be incurred by delay at the time the contract was executed. See *Dilley v. Thomas*, 106 Ark. 274, 153 S.W. 110 (1913).

■ Moreover, we find that even if we assume arguendo that the liquidated damages clause was reasonable and enforceable, it cannot be applied against S.O.G. in this case. Where the party who is seeking to enforce a liquidated damages provision of a contract is responsible for the failure to perform *or has contributed in part to it*, the liquidated damages provision will not be enforced. See, *e. g.*, *United States v. Kanter*, 137 F.2d 828 (8th Cir. 1943); *United States v. John Kerns Construction Co.*, 140 F.2d 792 (8th Cir. 1944). We recognize that some jurisdictions allow apportionment but the better rule seems to be that where delays are occasioned by the mutual fault of the parties, the Court will not attempt to apportion but will refuse to enforce the provision for liquidated damages. *Gogo v. Los Angeles County Flood Control*, 45 Cal. App.2d 334, 114 P.2d 65 (1941); *Jefferson Hotel Co. v. Brumbaugh*, 168 F. 867 (4th Cir. 1909); *Smith v. Tahlequah*, 117 Okl. 204, 245 P. 994 (1926); *General Insurance Company of America v. Commerce Hyatt House, et al.*, 5 Cal.App.3d 460, 85 Cal.Rptr. 317 (1970).

Even in those jurisdictions allowing apportionment, application of the rule depends on the situation in the particular case under consideration turning on whether apportionment could feasibly be made. In the case at bar the Court finds that the construction work and the delays of each of the parties were so interrelated that it would not be possible for the Court to attempt to break down and determine the number of days' delay for which each party was responsible. The Court could not fairly and justly delineate the delays and how much each affected the work schedule. This would be necessary to make an appropriate apportionment. At least some of the delay for which the Railroad seeks liquidated damages is attributable to the Railroad's own conduct, such as its failure to forward the naval architect's report to the Corps, and not passing information on to S.O.G. promptly. There is an implied provision in every contract that neither party to the contract will do anything to prevent prompt performance by the other party or commit any act which will hinder or delay performance. *Peter Kiewit Sons' Company v. Summit Construction Co.*, 422 F.2d 242, 257 (8th Cir. 1969), and *Investors Thrift Corporation v. Hunt*, 387 F.Supp. 517, 524 (W.D.Ark. 1974), *aff'd*, 511 F.2d 1161 (1975).

The record reflects that no substantial prejudice resulted to the defendants from the delay, and the Court is of the opinion that to impose liquidated damages would be an injustice under the circumstances of this case. Although the Court cannot say that the defendant was wholly without fault, many delays were also attributable to the actions of the plaintiff. The Court finds that the plaintiff has failed to carry the burden of proving it is entitled to increased costs under the contract or that any changes in the contract costs provisions should be made by implication. Therefore, no extra sums of money will be allowed for expenses caused by the delays.

S.O.G. alleges that Missouri Pacific has wrongfully retained certain sums due under the contract because of alleged delays and defective work. In addition to these sums, Missouri Pacific has withheld $70,000.00 for noise in the bearings of the lift mechanism.

The Court finds that although S.O.G. is not entitled to any increased costs, S.O.G. is entitled to be paid the sums retained by Missouri Pacific. Since the Corps of Engineers (although not a party) and Missouri Pacific were responsible to some extent for the delays encountered in the project, the sums due S.O.G. cannot be withheld on this basis.

Furthermore, as to the alleged defective work, the Court finds it has now been satisfactorily corrected and S.O.G. is entitled to payment for it.

As to the $70,000.00 payment withheld from S.O.G. because the bearings installed made a loud clanking sound when the bridge was raised and lowered, the record reflects that the bearings were purchased by S.O.G. from a recognized, reputable firm and were installed according to specifications. It also indicates that the sound did not in any way interfere with the efficient operation of the raising and lowering of the bridge span. Since the record indicates that the noise was no louder than that of a train crossing over the bridge and it did not interfere with the efficient operation of raising and lowering the span, the Court finds the condition of the bearings was in substantial compliance with the contract and Missouri Pacific should not have withheld $70,000.00 from the funds due S.O.G.

Other allegations have been made by both parties which are of a cumulative nature, but it is unnecessary to discuss them since they do not affect the decision herein.

Judgment will be entered in accordance with this opinion.