658 F.2d 562
 S.O.G.-SAN ORE-GARDNER, Appellant,
v.
MISSOURI PACIFIC RAILROAD COMPANY, Appellee,
v.
TRAVELERS INDEMNITY COMPANY.
S.O.G.-SAN ORE-GARDNER, Appellee,
v.
MISSOURI PACIFIC RAILROAD COMPANY, Appellant,
v.
TRAVELERS INDEMNITY COMPANY.
 Nos. 80-1891, 80-1934.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 15, 1981.
Decided Aug. 31, 1981.
 
 Herschel H. Friday and B. S. Clark, argued, Little Rock, Ark., for appellee/cross-appellant.
 Thomas M. Phillips, argued, Thomas R. Phillips, Houston, Tex., Ronald A. May, Little Rock, Ark., for appellant; Baker & Botts, Houston, Tex., Wright, Lindsay & Jennings, Little Rock, Ark., of counsel.
 Before LAY, Chief Judge, McMILLIAN, Circuit Judge, and LARSON,* Senior District Judge.
 LAY, Chief Judge.
 
 
 1
 S.O.G.-San Ore-Gardner (S.O.G.) entered into a contract on November 5, 1968, with the Missouri Pacific Railroad Company (Railroad) for the alteration of the Benzal Bridge over the White River, which is located near Benzal, Arkansas and is owned by the Railroad. The change was necessitated by the Arkansas River Project of the United States Army Corps of Engineers and the United States Coast Guard and included replacing the central pier and swing span with two new piers and a lift span. The contract provided for performance in three stages: Stage I (Substructure) Construction; Stage II (Change-out or Changeover) Construction; and Stage III (Superstructure) Construction. The contract contained, inter alia, a provision for liquidated damages of $600 per day if performance of the contract was not completed within the time period specified. The Railroad had also entered into a separate contract with the government on June 19, 1967, which obligated the United States to reimburse "all reasonable and legitimate costs" incurred by the Railroad in arranging and altering the bridge. This suit arises out of alleged damages incurred by both parties from the delay in completion of the project.
 
 
 2
 Difficulties and delays arose throughout the performance of the contract. The term for completion of the contract was originally set at 660 days, but it was later amended to 1122 days, which set the completion date at March 5, 1972. S.O.G. actually completed work on July 18, 1974, and the Railroad claimed approximately one-half million dollars in liquidated damages. S.O.G. filed a complaint against the Railroad, and later filed an amended and substituted complaint seeking damages for increased costs resulting from a funding delay;[1] S.O.G. also sought damages for an alleged material breach of the contract by the Railroad in failing to disclose the imposition by the Coast Guard of a seasonal restriction on the changeover phase. In addition, S.O.G. claimed additional damages resulting from a delay allegedly caused by the Railroad's failure to timely apprise the government of S.O.G.'s float-in and erection plans. Finally, S.O.G. made claim for certain monies retained by the Railroad as liquidated damages. The district court held that, although the Railroad and the government were partially at fault in causing many of the delays, S.O.G. was not entitled to any increased costs. The court also held the liquidated damages clause unenforceable as there was no "realistic consideration given to the elements of damage ... at the time the contract was executed." San Ore-Gardner v. Missouri Pac. R.R., 496 F.Supp. 1337, 1349 (E.D.Ark.1980). S.O.G. appeals that portion of the judgment denying it damages from the delay caused by the difficulties in obtaining the changeover permit and the delay surrounding the float-in.
 
 
 3
 I. Changeover Permit.
 
 
 4
 Prior to implementation of Stage I cofferdam construction, S.O.G. applied to the Coast Guard for a permit. It is this permit application and the following difficulties prior to execution of the Phase II changeover which initiated the most controversial delay in the project.
 
 
 5
 On August 22, 1968, prior to execution of the S.O.G.-MOPAC contract, the United States Coast Guard wrote to the Railroad's engineering consultants, stating:
 
 
 6
 The operation of the navigation span of this bridge is governed by Section 117.560(f)(26) of Title 33, Code of Federal Regulations. It will be necessary to publish a change to this special regulation to provide for the changeover period during which the swing span will be removed and the lift span will be inoperable. As soon as the approximate inclusive dates for this alteration period are known, the owner of the bridge should make application to this office for a change in this regulation.
 
 
 7
 Shortly after the S.O.G.-MOPAC contract was signed, MOPAC's engineering consultant gave S.O.G. a design memorandum prepared for the Corps of Engineers in 1967 which advised Phase II changeover during the fall months.
 
 
 8
 The first part of paragraph 6 of the S.O.G.-MOPAC contract special conditions states:
 
 
 9
 (a) General Requirements. Construction of a bridge over the navigable waters of the White River near Benzal, Arkansas has been authorized by an instrument of approval of location and plans therefor, signed by the Commandant, U. S. Coast Guard. Copies of this permit will be furnished to prospective bidders upon request. The Contractor shall assume all the obligations and shall comply with all of the requirements and provisions of this permit, which are applicable to the work of this contract.
 
 
 10
 (Emphasis added.)
 
 
 11
 S.O.G. urges that it interpreted this to mean that all necessary permits had been obtained. However, paragraph 6 further states:
 
 
 12
 All work in navigable waters shall be so conducted that free navigation of the waterway will not be unreasonably interfered with and that existing navigable depths will not be impaired.
 
 
 13
 The Contractor shall communicate with the appropriate agency or agencies and procure, at his own expense, all required permits. The Contractor shall comply fully and faithfully with the requirements established by the District Engineer, Corps of Engineers, the U. S. Coast Guard, and such other agencies, if any, as may have jurisdiction. Copies of all permits and authorizations shall be filed with the Engineer for information and record....
 
 
 14
 (b) Specific Requirements. The use of falsework, cofferdams or other temporary construction encroaching upon navigation channels will be permitted subject to the following requirement: Except during the "change-out" (Stage II construction) period, there shall be maintained at all times within the navigation channel a navigable horizontal clearance of sufficient width to safely accommodate the passage of a tow consisting of two 35-foot barges abreast.
 
 
 15
 All falsework or cofferdams so erected or other temporary construction facilities shall be removed completely and promptly upon discontinuation of their useful purpose.
 
 
 16
 If in case the Contractor's method proposes the use of falsework or other constrictions in the navigation channel, the Contractor shall furnish the details requesting a permit from the Coast Guard District and shall indicate therewith the clearance and method by which it will be maintained. In the event the Contractor's procedure requires a constriction in the navigation channel of less than the horizontal clearance specified for any period(s) of time prior to and/or following the Stage II construction period, it shall be his own responsibility to make the necessary arrangements with the Coast Guard District or other agency involved and to furnish such details and information as may be required by that agency....
 
 
 17
 (Emphasis added.)
 
 
 18
 In addition, paragraph 18 of the General Provisions of the S.O.G.-MOPAC contract provides, "The Contractor shall, at his own expense, obtain all permits required for the performance of work, and he must strictly comply with all laws and ordinances which may apply to the work."
 
 
 19
 On June 29, 1970, S.O.G. wrote to the Coast Guard requesting a permit to commence the cofferdam construction necessary for the erection of Stage I piers. The Coast Guard replied on July 8, 1970, acknowledging receipt of S.O.G.'s "plan of the cofferdam layout" and stating that its conditions regarding "construction of falsework, pilings or other obstructions" were imposed upon the bridge owner and that authorization to make application for approval on the owner's behalf was required. The letter also requested general information as to the sequence of construction and the estimated time that each stage would commence.
 
 
 20
 On July 20, 1970, and August 17, 1970, S.O.G. wrote again to the Coast Guard with the necessary authorization from the Railroad and provided sequence information which included, inter alia, reference to Phase II changeover occurring in December 1971 and January 1972. The Coast Guard's reply contained a request for additional information regarding construction of the cofferdam, referring to the potential navigational problems should S.O.G. intend concurrent construction of the cofferdams. Coast Guard approval was subsequently granted subject to certain conditions related solely to cofferdam construction and navigation lights. The approval letter dealt with cofferdam construction only; no reference to approval of Stage II was apparent. S.O.G. characterized this permit request of August 1970 as an application for Stage I cofferdam approval only. The Railroad viewed this permit as one for both Stage I and Stage II operations.
 
 
 21
 These initial permit characterizations did not become pertinent until S.O.G. was ready to commence the Stage II changeover. It is uncontroverted that S.O.G. did not complete the piers until November 1972, rather than November 1971 as originally forecast. S.O.G. apprised the Railroad of its progress throughout the contract and submitted a revised schedule on March 6, 1972, which reset changeover for November 1972. The Railroad replied on March 16, 1972, that it had made formal application to the Coast Guard to immobilize the drawspan of the bridge from November 1, 1972, to March 31, 1973. It is important to note that the Railroad, not S.O.G., actually applied for a changeover permit.
 
 
 22
 The Coast Guard denied the permit at this point because the proposed change was for the "high water season" and not for the "low water season" of June 30 to December 1. Consequently, the project was postponed from November 1972 to the following summer.
 
 
 23
 S.O.G. argues on appeal: (1) that the Railroad did not disclose that seasonal restrictions governed the time when the changeover could be done; (2) that there was nondisclosure by the Railroad as to the necessity for the permit of the changeover; (3) that the obligation to obtain the permit belonged to the Railroad; and (4) that there was interference by the Railroad in delaying the performance of the changeover.
 
 
 24
 The district court found that prior to the letting of the contract the Railroad knew that a Coast Guard permit would have to be obtained to allow the changeover. This notification was in a letter written to MOPAC by the Coast Guard on August 22, 1968. The Railroad denies that this was notice to it that the permit would not be allowed during the high water season.
 
 
 25
 S.O.G. concedes that the Railroad did not know of the seasonal limitation, but did know of the necessity for the permit. However, S.O.G. urges that the Railroad is liable as the "agent of the government." It argues that failure to disclose a significant factor concerning the performance of a construction contract is misleading and subjects a party furnishing plans and specifications to a contractor to liability. See Helene Curtis Indus., Inc. v. United States, 312 F.2d 774, 778 (Ct.Cl.1963); Centex Constr. Co. v. James, 374 F.2d 921, 923-24 (8th Cir. 1967); Restatement (Second) of Torts §§ 551, 552 (1977). We do not dispute this latter proposition. However, we have grave difficulty with the agency argument. First, it does not appear that this argument was presented to the district court. Second, we are satisfied that the Railroad does not become an agent of the government simply because it has a cost-plus contract with the government to build a bridge. See Brady v. Roosevelt S.S. Co., 317 U.S. 575, 583-84, 63 S.Ct. 425, 429-30, 87 L.Ed. 471 (1943); Curry v. United States, 314 U.S. 14, 17-18, 62 S.Ct. 48, 49-50, 86 L.Ed. 9 (1941); cf. Foster v. Day & Zimmermann, Inc., 502 F.2d 867, 875 (8th Cir. 1974) (contractual indemnification by the government cannot artificially create sovereign immunity). Third, assuming by some stretch of imagination an agency relationship existed, it is well settled that an agent may rely upon the representations of his principal and that the principal's undisclosed knowledge is not imputed to him. See generally Brooks v. Smith, 215 Ark. 421, 220 S.W.2d 801, 803 (1949); W. Seavey, Law of Agency 187, 222-23 (1964); Restatement (Second) of Agency §§ 320, 348 (1958). Thus, the nondisclosure by the government to the Railroad as to seasonal restriction on the changeover is not a basis of liability of the Railroad to its contractor, S.O.G.[2]
 
 
 26
 The Railroad concedes, as the court found, that the necessity for a permit for the changeover was known to it before the letting of the contract. S.O.G. urges that this fact was not disclosed to it. It urges that the only knowledge it had at the time of the bidding concerned the necessity to obtain permits relating to navigational safety, such as lighting, and horizontal clearances for river traffic during construction. It urges that the representation within the contract documents that construction of the bridge had been authorized by the Coast Guard implicitly conveyed to it that the Coast Guard had approved the entire course of construction as a necessary part of the job. It urges that substitution of the old swing span with the new was an integral step in the bridge alteration and to suggest that further authorization would be necessary was not within their contemplation.
 
 
 27
 The district court found that under paragraph 6 of the special conditions, as well as under paragraph 18 of the general provisions of the contract, it was encumbent upon the contractor (S.O.G.) to "communicate" and "procure" from the Coast Guard "all required permits."
 
 
 28
 Although it was the Railroad who actually applied for the changeover permit on August 2, 1972, the district court found that, notwithstanding, the contractor had the primary responsibility for securing the permit and, therefore, was primarily responsible for the delay.
 
 
 29
 We must agree with the district court that the contract makes clear that it is the contractor's responsibility to procure all permits. Although the contractor alleges that it interpreted this provision to cover other requirements, it is difficult for us to accept that the contract is ambiguous as to the obligation of the parties. The contract does not attempt to specify all the permits necessary. The recognition of the authority to proceed to build the bridge does not, in our judgment, provide implicit authorization for essential permits. We must agree with the district court that the special conditions of paragraph 6 "make it clear that it was S.O.G.'s primary duty to obtain the permit for changeover as well as for cofferdam work on any phase of construction that might impair navigation." Within such recognized obligations there exists sufficient language to alert a reasonable bidder that Coast Guard approval would have to be obtained concerning work interfering with navigation.
 
 
 30
 In this regard, the district court also found that the correspondence indicates that S.O.G. understood, or should have understood, that, under its contract with Missouri Pacific, the duty to communicate with the Coast Guard and the Corps of Engineers to obtain the necessary permits was imposed upon it. S.O.G. did abide by the Coast Guard's proposed low water changeover plan for the 1972 season and, except for S.O.G.'s own admitted delay of one year in the Stage I pier construction, the changeover could have been accomplished much sooner. On March 29, 1971, Missouri Pacific advised S.O.G. that the November date presented serious problems because this was a period of high water and permission would be difficult to obtain. These findings are not clearly erroneous. Fed.R.Civ.P. 52(a).
 
 
 31
 Although there exists conflicting evidence and inferences as to the delay and alleged interference of the Railroad in effecting the changeover, the district court assessed the ultimate delay to be at the hands of the plaintiff. The court found: "The evidence shows that S.O.G. did not complete the piers until November 1972 and did not meet any of its previous schedules. The evidence also shows that the delays were in construction work. S.O.G. admitted to a year's delay in completing the Stage I pier work. Consequently the Court cannot hold Missouri Pacific responsible for these delays."
 
 
 32
 There is evidence to support this finding in the record. We cannot try the case de novo.
 
 
 33
 II. Interference With Float-In and Erection Procedures.
 
 
 34
 S.O.G. claimed increased costs due to interference by the Railroad with the float-in and erection procedures. On December 6, 1972, S.O.G. submitted its float-in and erection plans to the Railroad showing July 1, 1973, as a target date. Approximately two months later, in February 1973, the Railroad replied that its engineering consultants and the Corps of Engineers had serious concerns about certain aspects of the floating system and "strongly recommended" review and certification of the system by a naval architect. On March 7, 1973, S.O.G. sent a letter and the requested naval architect's report to the Railroad and a copy to its engineering consultants.
 
 
 35
 On March 14, 1973, the Railroad replied in part:
 
 
 36
 We are glad to be advised that you have been assured by your consulting naval architects that all is satisfactory. Receipt is acknowledged of copy of your consultant's report, dated February 15, 1973, per our files.
 
 
 37
 S.O.G. proceeded with its preparations. However, the Corps of Engineers became concerned about high water levels, and the Railroad asked whether S.O.G. would like to postpone float-in for a couple of weeks. S.O.G. replied in the negative to the suggested delay. Only two weeks prior to the target date, on June 14, 1973, S.O.G. received informal word that the Corps of Engineers had objections to its plans. S.O.G. then discovered that the Railroad had not mailed the naval architect's report to the Corps of Engineers until June 11, 1973, over three months after receipt from S.O.G. Numerous changes and additional requirements were then imposed on S.O.G.'s float-in procedure. In addition, the Railroad advised S.O.G. on June 21, 1973, that S.O.G. had failed to give the contractually required 30 days advance notice of the changeover date. Changeover, therefore, could not be effectuated before July 21, 1973. As a result of the required alterations, changeover did not occur until August 11, 1973.
 
 
 38
 S.O.G. argued that the Railroad's failure to timely forward the naval architect's report to the Corps of Engineers operated as a breach of the implied contractual duty of cooperation and noninterference. "It is hornbook law that an implied provision of every contract is that neither party to the contract will do anything to prevent performance thereof by the other party or commit any act that will hinder or delay performance." Peter Kiewit Sons' Co. v. Summit Constr. Co., 422 F.2d 242, 257 (8th Cir. 1969), cited in Howard P. Foley Co. v. J. L. Williams & Co., 622 F.2d 402, 407 (8th Cir. 1980) (applying Arkansas law); also cited in Investors Thrift Corp. v. Hunt, 387 F.Supp. 517, 524-25 (W.D.Ark.1974), aff'd, 511 F.2d 1161 (8th Cir. 1975) (applying Arkansas law). See also Restatement of Contracts §§ 295, 315 (1932).
 
 
 39
 The Railroad attributed the delay to S.O.G.'s failure to timely obtain the Stage II permit and to S.O.G.'s insufficient progress in changeover preparations. No justification was advanced for the Railroad's delayed forwarding of the naval architect's reports to the Corps of Engineers.
 
 
 40
 The district court found both parties at fault, but denied recovery to the plaintiff, stating:
 
 
 41
 This does not mean that Missouri Pacific is without fault. No satisfactory explanation has been given for its failure to promptly transmit the naval architect's report to the Corps of Engineers. However, this delay was so interwoven with the delays for which plaintiff was responsible, and those caused by other parties, that the Court does not find it of such material consequence as to indicate plaintiff has carried the burden of proof as is necessary to recover for increased costs.
 
 
 42
 San Ore-Gardner v. Missouri Pac. R.R., 496 F.Supp. 1337, 1347 (E.D.Ark.1980).
 
 
 43
 Although the evidence shows that both parties' actions contributed in part to the float-in delay, it fails to preponderate in such a way as to require reversal of the district court's findings. Nonetheless, we believe a sufficient showing of interference by the Railroad to preclude recovery of liquidated damages for this period has been displayed.
 
 
 44
 III. Liquidated Damages.
 
 
 45
 Article Three of Section Two of the Special Conditions of the S.O.G.-MOPAC contract stated that liquidated damages of $600 per day would be assessed for each consecutive calendar day that S.O.G. delayed completion past the stipulated period. The stipulated completion date pursuant to Change Order No. 6 was March 5, 1972. Both parties agreed that the contract was actually completed on July 18, 1974. The Railroad claimed liquidated damages or, in the alternative, actual damages of $518,400.00. S.O.G. claimed that no actual damages had been sustained by the Railroad and that the liquidated damages clause was unenforceable as a penalty.
 
 
 46
 In Arkansas the general law with regard to stipulated or liquidated damages is "where the damages arising on a breach of a contract are uncertain and difficult of ascertainment, a stipulation for the payment of a designated sum, if reasonable, will be sustained as for liquidated damages." In re Lammers, 211 F.Supp. 448, 449 (E.D.Ark.1962); Breeden Dodge, Inc. v. Acme Indus. Laundry, Inc., 601 S.W.2d 239, 241 (Ark.App.1980); Hall v. Weeks, 214 Ark. 703, 217 S.W.2d 828, 830 (1949); see Smith v. Dixon, 238 Ark. 1018, 386 S.W.2d 244, 247 (1965). "(A)n agreement in advance of breach will be enforced if the sum named is a reasonable forecast of just compensation for the injury, if the harm is difficult or incapable of accurate estimation." Hall v. Weeks, 214 Ark. 703, 217 S.W.2d 828, 830 (1949) (emphasis added). However, sums stipulated as liquidated damages "will be regarded as a penalty if the sum agreed to exceeds the measure of a just compensation and the actual damages sustained are capable of proof." Phillips v. Ben M. Hogan Co., Inc., 594 S.W.2d 39, 41 (Ark.App.1980). The intent of the parties will generally control as to whether a liquidated damages provision is a penalty or not, but "the mere fact that the words 'liquidated damages' are used in the contract is not controlling." Reed v. Wright, 603 S.W.2d 422, 426 (Ark.App.1980).
 
 
 47
 The district court found that the liquidated damages was not the subject of negotiation, was not "a bona fide attempt by both contracting parties to agree in advance on a reasonable forecast of just compensation for any harm which would be caused by delayed performance on the part of S.O.G." San Ore-Gardner v. Missouri Pac. R.R., 496 F.Supp. 1337, 1348-49 (E.D.Ark.1980). The record indicates that the Railroad's consulting engineer drew up the contract provisions, which included the liquidated damages clause, at the behest of the Railroad. S.O.G. apparently did not participate in any way in estimating the $600 per day liquidated damages. The Railroad's purported basis for the figure was to cover potential shippers' claims arising out of any delay. No shipper's losses were ever incurred, but even if any had arisen, the Government-MOPAC contract provided reimbursement for all reasonable costs incurred by the Railroad in altering the bridge. The fact that there was no reasonable basis at the time the S.O.G.-MOPAC contract was entered into indicates that there was no reasonable forecast of damages ever made.
 
 
 48
 The Railroad states that Arkansas follows the general rule that a person liable for damages cannot take advantage of payments received by the damaged party from a collateral source, citing Chaney v. Duncan, 194 Ark. 1076, 110 S.W.2d 21 (1937). However, the Chaney case, which involved automobile accident insurance, merely stands for the proposition that a negligent party may be held liable regardless of whether damages are payable to the plaintiff or to the plaintiff's insurer. Although the Government-MOPAC contract provided for cost reimbursement, the government was not an insurer and was not subrogated to the rights of the Railroad as to its claims against S.O.G. The Chaney case, thus, appears inapposite to the case at bar.[3]
 
 
 49
 The district court further held that the Railroad could not recover the liquidated damages sought against S.O.G., even if the clause was reasonable and enforceable, because the Railroad contributed in part to S.O.G.'s failure to perform. "(I)t is ... established that where one seeking to enforce a provision for liquidated damages is responsible for the failure of performance, or has contributed in part to it, the provision will not be enforced." United States v. Kanter, 137 F.2d 828, 830 (8th Cir. 1943); United States v. John Kerns Constr. Co., 140 F.2d 792, 795 (8th Cir. 1944); see City of Whitehall v. Southern Mechanical Contracting, Inc., 599 S.W.2d 430, 435 (Ark.App.1980). Because the Railroad's failure to timely forward the naval architect's report to the Corps of Engineers contributed to the delay in the changeover, we agree that the Railroad should be precluded from recovering the liquidated damages for delay of performance.
 
 
 50
 The Railroad argues further that many jurisdictions apply a rule of apportionment to liquidated damages clauses in cases where both parties have contributed to a delay. E. C. Ernst, Inc. v. Manhattan Constr. Co., 551 F.2d 1026, 1038-39 (5th Cir. 1977), reh. denied, in part, reh. granted, in part, 559 F.2d 268, cert. denied sub nom. Providence Hosp. v. Manhattan Constr. Co., 434 U.S. 1067, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978); United States v. B. R. Abbot Constr. Co., 466 F.2d 712, 714 (7th Cir. 1972); Barnard-Curtiss Co. v. United States, 257 F.2d 565, 569 (10th Cir.), cert. denied, 358 U.S. 906, 79 S.Ct. 230, 3 L.Ed.2d 227 (1958); see also Dallas-Fort Worth Regional Airport Bd. v. Combustion Equip. Assoc., Inc., 623 F.2d 1032, 1037-38 (5th Cir. 1980); Brecher v. Laikin, 430 F.Supp. 103, 107 (S.D.N.Y.1977). Contra, United States v. United Eng'r & Contracting Co., 234 U.S. 236, 241-44, 34 S.Ct. 843, 845-46, 58 L.Ed. 1294 (1914); Jefferson Hotel Co. v. Brumbaugh, 168 F. 867, 874-75 (4th Cir. 1909); Haggerty v. Selsco, 166 Mont. 492, 534 P.2d 874, 878-79 (1975); State v. Jack B. Parson Constr., 93 Idaho 118, 456 P.2d 762, 764-65 (1969); Gogo v. Los Angeles County Flood Control Dist., 45 Cal.App.2d 334, 114 P.2d 65, 70-71 (1941); see also Annot., 152 A.L.R. 1349, 1359-78 (1944) for the split of authority with regard to apportionment of liquidated damages. Arkansas has apparently retained the rule against apportionment. See City of Whitehall v. Southern Mechanical Contracting, Inc., 599 S.W.2d 430, 435 (Ark.App.1980). The district court denied apportionment based more upon the interrelatedness of the parties' delays than upon its reading of Arkansas law. Both the difficulty in delineation of fault and the apparent position of the Arkansas courts support the district court's conclusion to deny apportionment of liquidated damages.
 
 
 51
 IV. Conclusion.
 
 
 52
 A careful review of the record and the law indicates that the district court should be in all things affirmed.
 
 
 53
 Judgment affirmed.
 
 
 
 *
 Earl R. Larson, Senior District Judge, District of Minnesota, sitting by designation
 
 
 [1]
 The record demonstrates that the numerous delays in the Benzal River project began materializing at the outset. S.O.G. was awarded the job as low bidder and entered into the contract with the Railroad on November 5, 1968. However, authorization to commence working was not given until February 7, 1969. The Railroad attributed this initial three-month delay to S.O.G.'s insurance difficulties. Upon commencement of work on Phase I, confusion arose over government funding of the project. The government's contracting officer notified the Railroad that sufficient funds were not immediately available for the project, but formal notice to suspend work with the accompanying contractual rights was never given S.O.G. The district court found that S.O.G. was entitled to no damages for this delay, and no appeal is taken by S.O.G. as to that portion of the district court's ruling
 
 
 [2]
 In addition, it is significant, as the district court found, that long before the permit was obtained and the work was ready to be performed, S.O.G. was apprised of the necessity for the permit and the potential problems regarding seasonal changeovers
 On March 29, 1971, MOPAC advised S.O.G. of the possibility of serious problems in obtaining permission from the Coast Guard during a period of high water. A memorandum of a meeting on May 5, 1971, between the Railroad and its engineering consultant, makes specific reference to "problems with the U. S." and erection of the new lift span in high water. A memorandum of a subsequent meeting of February 3, 1972, attended by S.O.G.'s subcontractor, the Railroad, and its consultant, also refers to the Coast Guard's probable position regarding changeover during low water.
 
 
 [3]
 The collateral source rule appears to apply to tortfeasors only, not to those in breach of contract. See Amos v. Stroud, 252 Ark. 1100, 482 S.W.2d 592, 596 (1972); see also Note, Unreason In The Law of Damages: The Collateral Source Rule, 77 Harv.L.Rev. 741 (1964)