**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 30, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

HUTTON CONTRACTING
COMPANY, INC.,

        Plaintiff - Appellant,

  v.

CITY OF COFFEYVILLE,

        Defendant - Appellee.

No. 05-3223

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 02-CV-4130-JAR)**

---

Bryan W. Smith, Cavanaugh, Smith & Lemon, P.A., Topeka, Kansas, for Plaintiff - Appellant

Justice B. King (Richard Petersen-Klein with him on the brief), of Fisher, Patterson, Sayler & Smith, LLP, Topeka, Kansas, for Defendant - Appellee

---

Before **HARTZ**, **EBEL**, and **O'BRIEN**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

    Hutton Contracting Company, Inc., a North Dakota corporation based in Colorado, contracted to construct a power line and a fiber-optic line for the City of Coffeyville, Kansas. Upon completion of the project the City refused to pay

the final $110,159.47 out of the contract price of $1,131,947.12, claiming that it was entitled to these funds as liquidated damages because of Hutton's delays. Hutton sued the City in the United States District Court for the District of Kansas to obtain the unpaid amount of the contract price. *See* 28 U.S.C. § 1332 (diversity jurisdiction). After a jury trial the court ordered the City to pay Hutton $24,659.47—the retainage of $110,159.47 minus $85,500.00 in liquidated damages to which the City was entitled.

Hutton appeals from this judgment, challenging four holdings by the district court: (1) that the contract's force-majeure clause did not excuse Hutton for delays caused by late deliveries from its pole supplier; (2) that the contract's liquidated-damages provision was enforceable; (3) that the liquidated-damages provision allowed the court to apportion delays between Hutton and the City; and (4) that Hutton was not entitled to prejudgment interest on its damages. Hutton also challenges (5) a special interrogatory asking the jury whether the parties had modified their contract and (6) the court's responses to questions from the jury. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

I.      BACKGROUND

A.      Contract and Performance

The contract between Hutton and the City is dated March 28, 2000. The engineer designated for the project was Allgeier, Martin & Associates, Inc. (the

Engineer).  Rather than specifying when construction was to begin, the contract

contained the following provision:

> [Hutton] agrees to commence construction on the Project on a date
> (hereinafter called the "Commencement Date") which shall be
> determined by the Engineer after notice in writing of approval of the
> Contract by the [City] and notice in writing from [Hutton] that
> [Hutton] has sufficient materials to warrant commencement and
> continuation of construction, but in no event will the Commencement
> Date be later than **\* (See Special Conditions)** calendar days after
> date of approval of the Contract by the [City].

Aplt. App. Vol. IV at 933.  (The cross-referenced Special Conditions provide that

"[t]he starting date shall be no later than May 1, 2000," *id.* at 969, but this date

never figures explicitly in the parties' arguments.)  The contract contemplated

completion of construction within 45 days of commencement (excluding

Sundays), with flexibility for bad weather:

> [Hutton agrees] to prosecute diligently and to complete construction
> phases as described in strict accordance with the Plans,
> Specifications and Construction Drawings within **Forty-five (45)**
> calendar days (excluding Sundays) after Commencement Date;
> Provided, however, that [Hutton] will not be required to perform any
> construction on such days when in the judgment of the Engineer
> snow, rain, or wind or the results of snow, rain or frost make it
> impracticable to perform any operation of construction and to extent
> of the time lost due to the conditions described herein and approved
> in writing by the Engineer, the time of completion set out above will
> be extended if [Hutton] makes a written request therefor to the
> [City] . . . .

*Id.* at 933.  A provision that both parties call a force-majeure clause gave Hutton

more time to complete the project in exceptional circumstances, provided that it

submitted requests for extensions in writing:

The time for Completion of Construction shall be extended for the period of any reasonable delay which is due exclusively to causes beyond the control and without the fault of [Hutton], including Acts of God, fires, floods and acts or omissions of the [City] with respect to matters for which the [City] is solely responsible: Provided, however, that no extension of time for completion shall be granted [Hutton] unless within ten (10) days after the happening of any event relied upon by [Hutton] for such an extension of time [Hutton] shall have made a request therefor in writing to the [City], and provided further that no delay in such time of completion or in the progress of the work which results from any of the above causes or from any changes in construction which may be made pursuant to Subsection "d" of this Section 1 [which allowed the City to modify the construction plans and provide extensions therefor] shall result in any liability on the part of the [City]. Time extensions due to weather will be considered only when [Hutton] is on site.

*Id.*

The contract required the City to pay Hutton within 90 days of the project's completion:

Upon completion by [Hutton] of the construction of the project, the Engineer will prepare an inventory of the Project showing the total number and character of Construction Units and, after checking such Inventory with [Hutton], will certify it to the [City] together with a certificate of the total cost of the construction performed. Upon the approval of such certificates by the Engineer, the [City] shall make payment to [Hutton] of all amounts to which [Hutton] shall be entitled thereunder which shall not have been paid, provided, however, that such final payment shall be made not later than ninety (90) days after the date of Completion of Construction of the Project as specified in the Certificate of Completion, unless withheld because of the fault of [Hutton].

*Id.* at 936. But the amount owed would be reduced by $500 in liquidated damages for each day by which the completion of the project was late:

-4-

The time of the Completion of Construction of the Project is of the essence of the Contract. Should [Hutton] neglect, refuse or fail to complete the construction within the time herein agreed upon, after giving effect to extensions of time, if any, herein provided, then, in that event and in view of the difficulty of estimating with exactness damages caused by such delay, the [City] shall have the right to deduct from and retain out of such monies which may be then due, or which may become due and payable to [Hutton], the sum of **FIVE HUNDRED DOLLARS ($500.00)** per day for each and every day that such construction is delayed on its completion beyond the specified time, as liquidated damages and not as a penalty.

*Id.* at 943.

The parties have disputed the contractual commencement date, the completion date, and the number of days of excused delay. Both agree that a commencement date of August 9, 2000, was set at a preconstruction conference on August 4, 2000. But Hutton asserts that the City set the date "arbitrarily," Aplt. Br. at 4, and therefore contrary to the contract. In any event, Hutton began clearing the construction site—the first step in the construction process—on August 10, 2000.

Four days later Hutton sent a letter to the Engineer stating that some utility poles would not be available before late October. The letter requested "that the commencement date be adjusted to October 23, 2000, due to the insufficient material being on hand. The delivery of steel poles has been the cause of this delay." Aplt. App. Vol. IV at 1066.

The Engineer eventually responded to this letter on October 10, 2000, agreeing to the proposed start date on condition that the project be completed within 45 days:

> You have requested to begin construction on October 23, 2000. We will arrange to have an inspector there on that day. You have further requested the contract commencement day be moved to October 23, 2000. We have discussed this with Mr. Jeff Tullis at the City of Coffeyville and reiterate their position stated during the preconstruction conference and again with you by telephone. The City of Coffeyville is willing to forgo liquidated damages provided that the project is entirely completed within 45 days as defined in the contract, with construction beginning on October 23, 2000. Should the project not be completed within that time, each day that the project extends past the 45 day construction period would be subject to liquidated damages. Days used for clearing [i.e., those during which Hutton performed its original clearing work, before the new "commencement" date of October 23] would also then be included in the liquidated period.

*Id.* at 1069. Hutton commenced construction on October 23.

Hutton noticed in November that some of the poles that had been delivered were defective. (Delivery of poles had started in mid-September.) On December 7 it requested another extension—this time for 30 days—because of the late delivery of the remaining poles. It also submitted several requests for extensions due to weather conditions.

The lines were ready for use by March 22, 2001. But for more than a year the parties disputed whether the project had been completed. In a fax on April 20, 2001, the Engineer sent Hutton a list of clean-up tasks that it needed to perform. Hutton responded on May 4, 2001, asserting that all tasks had been

accomplished. A November 28, 2001, fax from the City to Hutton stated that cleanup was not yet complete. Finally, on August 5, 2002, the City sent Hutton a notice that it was retaining the balance due of $110,159.47. It attached a letter from the Engineer asserting that work was just completed on July 9, 2002, and claimed that it was entitled to further liquidated damages for delay; but it offered to settle by paying $34,159.47 of the retainage.

### B.    Court Proceedings

Seeking the full retainage, Hutton filed its suit on August 21, 2002. It claimed that it had performed all its duties under the contract and was entitled to the full contract price. It contended that the construction's commencement date under the contract was October 23, 2000, that construction was substantially complete by March 22, 2001, that the City either approved or was obliged under the contract to have approved extensions of time, and that the contract excused it from responsibility for delays caused by its suppliers. Hutton also alleged that the City had violated its duty of good faith and fair dealing under the contract by not granting extensions of time, requesting unneeded repairs, and failing to facilitate the completion of cleanup-related tasks. The City countered that the project was not complete until July 9, 2002, and that it had not improperly denied extensions of time. The parties also disputed whether the Engineer's letter of October 10, 2000, modified any terms of the contract.

The district court resolved several issues before sending the case to the jury. It held that the contract's force-majeure clause did not excuse Hutton's delay caused by late delivery of poles, because the supplier's tardiness did "not qualify as . . . extraordinary, beyond the control or fault of the bidder," as the clause contemplated. Aplt. App. Vol. II at 778. It stated that "problems with the supplier were not totally without the fault of [Hutton] . . . because [it] made the conscious choice to contract with this supplier and assumed the risk that that supplier would perform so that [it] could, in fact, perform on its contract with the city." *Id.* at 779. The court also held that the contract's liquidated-damages provision was enforceable.

The district court submitted several special interrogatories to the jury. One asked whether the parties had modified their contract in accordance with the terms described in the Engineer's October 10 letter to Hutton. Another asked how many days' worth of liquidated damages should be denied the City because of its breach of the duty of good faith and fair dealing. During deliberations the jury requested that the court explain how damages would be computed based on the number of days of delay, but the court responded that the monetary amount was not for the jury to decide. In response to the special interrogatories, the jury found that the parties had agreed to a construction commencement date of October 23, 2000; that construction had been completed on May 4, 2001 (significantly more than 45 days after commencement); that 20 days of delay were

excusable because of weather; and that the City had breached its contractual duty of good faith and fair dealing and therefore should not recover liquidated damages for 23 days of delay.

In entering judgment the district court held that the City was "entitled to liquidated damages due to Hutton's untimely completion of the project . . . [for days that are] unrelated to the City's breach of the duty of good faith." Aplt. App. Vol. I at 152. The court also denied prejudgment interest on its award to Hutton, explaining that the amount of the damages was not liquidated until the jury reached a verdict and that under Kansas law trial judges have discretion to deny prejudgment interest. The final judgment incorporated liquidated damages against Hutton for 194 days of delay attributable to Hutton minus 23 "days for which liquidated damages should not be recovered [by the City] because of [its] breach of its duty of good faith and fair dealing." *Id*. at 154. The liquidated damages for 171 days (194 minus 23) was $85,500. The court subtracted that amount from the retainage of $110,159.47 to determine that the City owed Hutton $24,659.47.

## II. DISCUSSION

Kansas law governs the substantive issues in this diversity case, and we review de novo the district court's determinations of state law. *See Boyd Rosene & Assocs., Inc. v. Kan. Mun. Gas Agency*, 174 F.3d 1115, 1118 (10th Cir. 1999). We review for clear error the district court's findings of fact. *Id*.

### A. Force-Majeure Clause

The contract's force-majeure clause contains the following language:

> The time for Completion of Construction shall be extended for the
> period of any reasonable delay which is due exclusively to causes
> beyond the control and without the fault of [Hutton], including Acts
> of God, fires, floods, and acts or omissions of [the City] with respect
> to matters for which [the City] is solely responsible.

Aplt. App. Vol. IV at 933. Hutton argues that late delivery of utility poles was "beyond the control and without the fault of [Hutton]." *Id*. In essence it contends that it should be excused for all delays caused by its suppliers or subcontractors, at least when those delays arise without its fault and are beyond its control. The district court rejected this contention on the ground that Hutton could be charged with fault in selecting the supplier.

In our view, the district court essentially got it right. The most reasonable interpretation of "fault of [Hutton]" in the force-majeure clause is "fault of Hutton and those to whom it delegates its responsibilities under the contract." The contract did not specify a source of the poles. The City was concerned only with the ultimate performance, not whom Hutton employed to reach the result. Under Hutton's interpretation of the force-majeure clause, it could protect itself from liability arising from a particular type of delay simply by arranging that a contractual partner assume responsibility for that type of delay. In other words, delays could be excused or not depending solely on whether Hutton chose to outsource a particular operation or line of supply. It would be absurd to assume

-10-

that the City was concerned about delay only when caused by Hutton, and not by a supplier or subcontractor that Hutton decided to employ. Not only would Hutton's interpretation provide a perverse incentive for contractors to outsource work and supplies needlessly, but it also ignores the potential legal remedies of the contracting parties. Under Hutton's view the supplier, the one ultimately responsible for the delay, would be immune from paying damages. Because Hutton would have no liability to the City arising from the supplier's delay, the supplier would owe nothing to Hutton on that account. And it is unclear how the City could have a contractual cause of action against the supplier, whose contract is only with Hutton. *See* Melvin A. Eisenberg, Third-Party Beneficiaries, 92 Colum. L. Rev. 1358, 1402–06 (1992) (owner should ordinarily not have cause of action against subcontractor unless contractor becomes insolvent). If, however, Hutton is liable to the City for the delay, it could seek relief from its supplier. In particular, if Hutton is concerned about paying damages caused by a supplier's delay, it can protect itself by paying the supplier a higher price and obtaining a delay-damages clause in its contract with the supplier.

We do not suggest that Hutton was at fault in its choice of supplier, only that it is responsible to the City for its supplier's delays when those delays are not themselves excused by a force majeure. Hutton does not suggest that the supplier's failure was caused by a natural catastrophe or the like. In short, a delay by a subcontractor or supplier is not itself a force majeure.

In so holding, we are not stating a new rule of contract law. Although we have not found a Kansas case in point, courts have treated contractors as responsible for the performance of their suppliers and subcontractors. *See, e.g., Johnson Mgmt. Group CFC, Inc. v. Martinez*, 308 F.3d 1245, 1252 (Fed. Cir. 2002) ("A contractor is responsible for the unexcused performance failures of its subcontractor"); *Olson Plumbing & Heating Co. v. United States*, 602 F.2d 950, 957 (Ct. Cl. 1979) ("The contractor alone is responsible for the deficiencies of its suppliers and its subcontractors absent a showing of impossibility. Plaintiff's failure to produce a leak-free system was due to the deficient design of [its] supplier [and was not] the fault of the Government."). Accordingly, a contractor assumes the risk that its subcontractor or supplier will fail, at least when its contract with the owner does not call for a specific supplier or subcontractor to complete a task. Decisions to this effect generally arise in cases analyzing the contract doctrines of impossibility and impracticability, but the lesson from such cases is nevertheless helpful in interpreting a force-majeure clause. As one treatise puts it:

> When a promised performance is known by both parties to be impossible unless some third party performs, it may be a reasonable interpretation that the promise is conditional upon performance by the third party. The performance would then be discharged if the third party does not do its part. This will usually not be the interpretation, however, if nothing is said about the third party's contract or involvement in the contemplated performance. In this context, a division among courts has developed in the so-called "middleman" cases, in which a seller agrees to supply a good to a

-12-

buyer but then contracts with another party to manufacture the good. . . . Courts have been more inclined to bind the middleman to the contract if the contract is silent on the source of supply, and more likely to release the middleman if the source is referenced in the agreement. . . . The originating source was more likely to be a basic assumption on which the contract was made (a so-called "sole source of supply" contract) if the source is mentioned in the agreement.

14-75 Corbin on Contracts § 75.6 (2006) (footnotes omitted). *See also Morin Bldg. Prods. Co. v. Volk Constr., Inc.*, 500 F. Supp. 82, 89 (D. Mont. 1980) ("In this case, Morin assumed the risk of performance; it assumed the risk that delivery of the metal siding would be delayed by problems with its subcontractors and suppliers. There is nothing in the contract between the parties which excuses Morin for delays caused by its subcontractors or suppliers. Thus Morin had an obligation to timely deliver . . . .").

We should add that our holding is a limited one. The sole concern here is damages for delay when time is of the essence of the contract. We are not deciding whether the City could have declared Hutton in default, sought another contractor, and recovered from Hutton for the increased cost. *Cf. United States v. Wegematic Corp.*, 360 F.2d 674, 675, 677 (2d Cir. 1966) (Friendly, J.) (rejecting an argument that performance was impossible and upholding liquidated damages for delay, but noting that it was not deciding whether "the Government could have . . . recover[ed] not merely [liquidated] damages for delay but also the higher cost of replacement equipment").

-13-

Hutton suggests that the commencement-date clause of the contract supports its interpretation of the force-majeure clause. It contends that the contract must contemplate that Hutton would be excused upon the late delivery of essential materials because the commencement date was to be set after "notice in writing from [Hutton] that [Hutton] has sufficient materials to warrant commencement and continuation of construction," Aplt. App. Vol. IV at 933. But we draw the contrary inference. Because Hutton is to provide notice that it has sufficient material before the commencement date is set, one would infer that it is responsible if its notice turns out to be erroneous. In other words, its notice constitutes a representation that the supply of necessary material will be adequate to complete the project on time; delay caused by lack of material is then its responsibility. We note that the force-majeure clause itself makes no reference to the availability of materials.

Hutton also argues that the City is partly responsible for the poles' delay because of the City's own delay in approving specifications. But even if this contention were correct, partial responsibility does not matter under the force-majeure clause, which makes the City's delays relevant only "with respect to matters for which [it] is solely responsible." Aplt. App. Vol. IV at 933. The City's contributions to delays could, however, affect the *amount* of damages to which it is entitled; we take up that question below.

Hutton's final argument on this issue is that it "qualified its bid based upon the supply of the poles." Aplt. Br. at 23. Hutton's bid included the following letter dated March 21, 2000, which Hutton argues was adopted as part of the contract: "Please be advised that this bid proposal is being submitted with material deliveries as follows: . . . Steel Poles — Sixteen (16) weeks after receipt of order." Aplt. App. Vol. IV at 946. But Hutton does not explain the relevance of this notice. The City asserts that all specifications for the poles were resolved by July 27, 2000, and that receipt of the poles 16 weeks later, on November 15, 2000, would have been "well within the completion time frame under the modified commencement date of October 23, 2000." Aplee. Br. at 25. Hutton offers no argument in response.

For the above reasons, we affirm the district court's determination that the force-majeure clause does not assist Hutton.

### B.    Liquidated Damages

Hutton challenges two rulings of the district court concerning the contract's liquidated-damages provision. First, Hutton argues that the provision is not enforceable because it is a penalty. Second, it argues that even if the clause is enforceable, the City's breach precluded its recovery of any liquidated damages, so apportionment of delay between Hutton and the City was improper.

#### 1.    Enforceability

Under Kansas law, "[t]he burden of proving that a liquidated damages clause constitutes an unenforceable penalty rests with the party challenging the provision." *IPC Retail Props., L.L.C. v. Oriental Gardens, Inc.*, 86 P.3d 543, 548 (Kan. Ct. App. 2004). In other words, "[t]he use of the terms 'penalty' or 'liquidated damages' in the [contract] . . . is given weight and is ordinarily accepted as controlling unless the facts and circumstances impel a contrary holding." *White Lakes Shopping Ctr., Inc. v. Jefferson Standard Life Ins. Co.*, 490 P.2d 609, 613 (Kan. 1971) (internal quotation marks omitted). Kansas courts distinguish unenforceable penalties from enforceable liquidated damages using "two considerations": first, whether the amount is "conscionable," that is, whether it is "reasonable in view of the value of the subject matter of the contract and of the probable or presumptive loss in case of breach"; second, whether the "nature of the transaction is such that the amount of actual damage resulting from default would not be easily and readily determinable." *Id.* (internal quotation marks omitted). Kansas law echoes traditional common-law principles in this respect. *See* Restatement (Second) of Contracts § 356(1) & cmt. b (1981) (Restatement).

There is some doubt, however, about the temporal perspective from which Kansas law evaluates the reasonableness of the liquidated-damages provision. In other jurisdictions some courts consider only the reasonableness of the provision at the time of contract formation. That is, only future damages, as conceived

prospectively when the contract is made, are relevant in evaluating the reasonableness of a liquidated-damages provision. *See, e.g.*, *Kelly v. Marx*, 705 N.E.2d 1114, 1117 (Mass. 1999) ("In addition to meeting the parties' expectations, the 'single look' approach helps resolve disputes efficiently by making it unnecessary to wait until actual damages from a breach are proved. By reducing challenges to a liquidated damages clause, the 'single look' approach eliminates uncertainty and tends to prevent costly future litigation."). Other courts additionally compare the amount that would be awarded under the liquidated-damages provision with the actual damages a promisee suffered; that is, they take an additional "retrospective" look at actual damages. *See Yockey v. Horn*, 880 F.2d 945, 953 (7th Cir. 1989) ("If the nonbreaching party has suffered no damages whatsoever from the breach, the Restatement suggests that the clause will be unenforceable, no matter how reasonable the estimate of damages was at the time of contracting.") (interpreting Restatement, *supra*, § 356 and applying Illinois law).

Although in *White Lakes* the Kansas Supreme Court evaluated damages only in prospective terms, our review of Kansas cases finds no definitive discussion of whether Kansas courts would also apply a supplemental retrospective analysis. *Accord Kelly v. Marx*, 694 N.E.2d 869, 874 (Mass. App. Ct. 1998) (conducting a state-by-state review of liquidated-damages rules and concluding, based on *White Lakes*, that Kansas is one of only a few states in

-17-

which the choice between a "single look" or "second look" analysis is unclear), *rev'd*, 705 N.E.2d 1114. (Mass. 1999). The City argues that Kansas requires only a single, prospective look at reasonableness. Hutton, however, contends that we also need to take a second (retrospective) look at the City's actual damages to determine whether the liquidated-damages provision was reasonable. The City may be correct; but we can assume, without deciding, that Hutton's view is Kansas law.

We summarily dispose of Hutton's argument on appeal that the liquidated-damages clause was not prospectively reasonable. Its appellate briefs fail to cite any occasion when it made this argument in district court, and we have found none. Absent special circumstances, we will not reverse on a ground not raised below. *See Wilson v. Merrell Dow Pharms., Inc.*, 160 F.3d 625, 628 (10th Cir. 1998). Therefore, we need not address the issue.

We reject Hutton's retrospective-analysis argument on the merits. Under a retrospective analysis, we compare the liquidated damages with the actual loss the City sustained from the construction's delay. Hutton argues that the City suffered no damages because it suffered no loss in revenue from delay in energizing the power line. To make this argument, Hutton cites a letter from the director of Coffeyville Municipal Light & Power:

> Bottom line, the City was not losing revenue or suffering in any way
> from the project being late other than the inconvenience of having a
> few more loose ends to keep track of than necessary.

> Although we could ask for more, I propose to withhold $76,000 from the $110,159.47 final payment request by the contract to reimburse the City for the estimated $75,932.50 in additional engineering/inspection costs resulting from the extremely long construction period.

Aplt. App. Vol. IV at 1085. Hutton would have us read this letter as an admission by the City that it suffered no damages at all from the delay. But in addition to noting that no revenue was lost, the letter also alleges that the City suffered approximately $76,000 in damages from the delay through increased engineering and inspection costs. Nothing limits liquidated-damages provisions to compensating for lost *revenue*. A reasonable liquidated-damages provision may well accommodate increased engineering and administrative costs. Because the award of liquidated damages ($85,500) was near the $76,000 figure, the liquidated-damages provision in this case was retrospectively reasonable.

### 2. Apportionment

Hutton also challenges the district court's decision to apportion delays between Hutton and the City rather than denying the City liquidated damages altogether. The jury's answers to special interrogatories regarding the commencement date and the completion date established that the project was delayed by 194 days. The court subtracted 23 days for which the jury found that the City should not recover liquidated damages because of its breach of the duty of good faith and fair dealing. In other words, the court adjusted the amount of

liquidated damages on the ground that Hutton was responsible for only some of the days of construction delay.

Hutton argues that because the jury found that the City breached its duty of good faith and fair dealing, the City may not seek *any* liquidated damages under the contract. Hutton relies on several old Kansas cases, although it admitted at oral argument that these cases are not decisive and that the issue is essentially one of first impression under Kansas law. The City for its part cites no cases supporting the contrary position.

We agree with Hutton that Kansas decisions do not resolve whether a party in breach may recover liquidated damages for the portion of a divisible delay not caused by its own breach. Two decisions are somewhat supportive of Hutton's argument against apportionment. In *Ritchie v. City of Topeka*, 138 P. 618 (Kan. 1914), the principal case relied on by Hutton, the Kansas Supreme Court considered a per-day liquidated-damages provision. The court held that an owner could not collect liquidated damages for a construction delay because the owner "occasioned delay [and] in effect notified [the other party] that it did not regard the forfeiture clause of the contract to be binding upon him"; the owner "was estopped thereafter to insist on a provision in the contract where it had prevented the performance"; and "to compel the payment of damages for which the [owner] was in a large part responsible would be unjust and inequitable." *Id.* at 620. *Ritchie*, however, does not appear to have considered the possibility that the delay

was divisible into delays caused by the contractor and delays caused by the owner. A more recent, although unpublished, Kansas Supreme Court decision cited by Hutton, *Busch v. McGinnis*, No. 59,647, Kan. LEXIS 377, *9 (Kan. June 12, 1987), holds that "when [one] contracting party makes it impossible for the other party to perform [or] fails to perform a condition precedent, the first party cannot recover damages when the second party breaches the contract." But *Busch* is inapposite because the City did not make it impossible for Hutton to perform, at least with respect to those days for which the City received liquidated damages, and it did not fail to perform a condition precedent.

On the other hand, *Luminous Neon, Inc. v. Parscale*, 836 P.2d 1201 (Kan. Ct. App. 1992), provides some support for apportionment. It cited favorably in dictum a Washington case that apportioned liquidated damages, *Baldwin v. National Safe Depository Corp.*, 697 P.2d 587, 590 (Wash. Ct. App. 1985). *Luminous* described *Baldwin* as follows: "In an action by lessor of signs to recover rental payments from lessee, provision in lease specifying liquidated damages of all unpaid past due rentals plus 80 percent of all future rentals was properly used as basis for apportionment of damage, notwithstanding plaintiff's partial breach." *Luminous Neon*, 836 P.2d at 1203. Yet this favorable reference to another jurisdiction's case is far from a clear holding on the question before us.

Hutton also cites two old cases from jurisdictions other than Kansas as standing for the proposition that when a party breaches, it necessarily becomes

-21-

ineligible to seek any liquidated damages under a contract. *See Bauman v. Peters*, 231 N.W. 613 (Minn. 1930); *Smith v. City of Tahlequah*, 245 P. 994 (Okla. 1926). We note that these cases may never have represented a consensus among jurisdictions, even in their era. *See, e.g.*, *Wallis v. Wenham*, 90 N.E. 396, 398 (Mass. 1910) (apportioning liquidated damages for delay); *Bedford–Carthage Stone Co. v. Ramey*, 34 S.W.2d 387, 391 (Tex. App. 1930) (same). But even if they did, they are now unpersuasive for two reasons. First, they appear to reflect a hostility to liquidated damages that arose from an outdated view that while parties could determine their own contractual obligations, damages were the province of the courts. *See E.C. Ernst, Inc. v. Manhattan Constr. Co.*, 551 F.2d 1026, 1038–39 (5th Cir. 1977) (noting "early judicial hostility to the use of privately agreed upon contract damage remedies"). Second, they appear to rely, as was common for opinions of the time, on the notion that decisions followed naturally from axioms that were presumed to be self-evident—for example, the axiom that once a party has violated the terms of a contract, it has abrogated all terms in the same contract and cannot then enforce rights under it. Thus, *Tahlequah*, 245 P. at 996, cited by Hutton, quotes favorably the following language from a hoary authority known as *Ruling Case Law*:

> The plaintiff cannot recover liquidated damages for a breach for which he himself is responsible or to which he has contributed, and as a rule there can be no apportionment of liquidated damages where both parties are at fault. Hence, if the parties are mutually responsible for the delays because of which the date fixed by the

-22-

contract for completion is passed, the obligation for liquidated damages is annulled, and in the absence of some provision under which another date can be substituted, it cannot be revived. And so it has been held that a provision in a contract to the effect that deviations may be made at the instance of the owner without annulling or invalidating the contract, does not operate to renew a right to liquidated damages for delay in completing the work after the provision therefor has been abrogated by delay to which the owner materially contributed.

*Id.* at 996. It then summarizes this principle as follows: "The right to recover liquidated damages being once abrogated cannot be renewed or revived except by subsequent agreement." *Id.*

For some time now, however, Kansas contract law has followed the parties' intentions rather than formalism. *See Koepp v. Pribyl*, 485 P.2d 1388, 1390 (Kan. 1971) ("The purpose of the contract, so as to carry out the intention of the parties, is to be arrived at by considering and construing the instrument in its entirety."). And when there are gaps in the contract, Kansas courts will fill them with terms that are "reasonable in the circumstances." *NEA-Coffeyville v. Unified Sch. Dist. No. 445*, 996 P.2d 821, 829 (Kan. 2000) (quoting Restatement, *supra*, § 204). We believe that whether we surmise what the parties' views would have been when the contract was executed or whether we simply insert a reasonable term in that contract, damages for delay should be imposed for those delays, and only those delays, for which the contractor is responsible. Apportionment of damages based on fault comports with modern notions of fairness, as reflected, for example, in the near-universal adoption of comparative responsibility in tort actions. And

-23-

such apportionment can encourage efficient behavior. *See Stop Loss Ins. Brokers,*

*Inc. v. Brown & Toland Med. Group*, 143 Cal. App. 4th 1036, 1052 (Cal. Ct. App.

2006). Persuasive authority supports this approach.

The Supreme Court long ago so interpreted a government contract. In

*Robinson v. United States*, 261 U.S. 486, 488 (1923), the Court held that damages

could be apportioned under a contract that it described as follows:

> The original contract provided that the contractor "shall be allowed
> one day, additional to the time herein stated, for each and every day
> of . . . delay [that may be caused by the Government]"; "that no
> claim shall be made or allowed to [the contractor] for any damages
> which may arise out of any delay caused by [the Government]," and
> that the contractor shall pay $420 for each and every day's delay not
> caused by the United States.

*Id.* at 487–88. In an opinion by Justice Brandeis, the Court reasoned:

> The fact that the government's action caused some of the delay
> presents no legal ground for denying it compensation for loss
> suffered wholly through the fault of the contractor. Since the
> contractor agreed to pay at a specified rate for each day's delay not
> caused by the government, it was clearly the intention that it should
> pay for some days' delay at that rate, even if it were relieved from
> paying for other days.

*Id.*

Although the Williston treatise, relying primarily on older cases, concludes

that delay caused by the parties is "not generally . . . apportioned," it recognizes

an exception for construction contracts in circumstances similar to ours:

> In building contracts, the architect often has the power to extend the
> time of performance under certain circumstances, and a delay caused
> by the owner operates merely as an extension of the time for

-24-

performance, and a new time is substituted for the old. In that event though the owner causes delay the builder is liable in liquidated damages, but the period of delay caused by the owner is deducted from the total delay.

24 Richard A. Lord, Williston on Contracts § 65:8 (4th ed. 2006) (footnote omitted). As in the situations described by the treatise, the force-majeure clause in Hutton's contract with the City extends the time for completion for delays caused by "acts or omissions of the [City] with respect to matters for which the [City] is solely responsible," Aplt. App. Vol. IV at 933, although Hutton was required to request the extension within 10 days of the delay-causing event.

Moreover, our review of decisions during the past 30 years shows that a strong majority adopt our view. *See Dallas-Fort Worth Reg'l Airport Bd. v. Combustion Equip. Assocs., Inc.*, 623 F.2d 1032, 1038 (5th Cir. 1980) (approving, under Texas law, apportionment of liquidated damages for delay based on fault of parties, although reversing because answers to special interrogatories were irreconcilable); *Ernst*, 551 F.2d at 1038–39; *Aetna Cas. & Sur. Co. v. Butte-Meade Sanitary Water Dist.*, 500 F. Supp. 193, 197 (D.S.D. 1980) (applying South Dakota law, which had not addressed this issue, and stating that "recent case law is clearly in favor of such apportionment of fault and that simply because Defendant contributed to the delay in the completion of the project, it should not be barred from recovering liquidated damages."); *Hertzberg v. Nunn Bush Shoe Co. (In re Const. Diversification, Inc.)*, 36 B.R. 434, 437 (Bankr. D.C.

Mich. 1983) ("[T]he non-apportionment rule simply does not apply to . . . a situation where responsibility for discrete days of delay can be apportioned under a per diem liquidated damages provision."); *Stop Loss Ins. Brokers*, 143 Cal. App. 4th at 1052 ("Rejecting the prior all-or-nothing rule, [California] courts have applied apportionment principles to allocate contractual liquidated damages where delays in construction projects have been caused both by the owner and by the contractor."); *Calumet Constr. Corp. v. Metro. Sanitary Dist. of Greater Chicago*, 533 N.E.2d 453, 457 (Ill. App. Ct. 1988) (applying what it calls the "modern rule of apportionment"). *But see San Ore-Garner v. Mo. Pac. R.R. Co.*, 496 F. Supp. 1337, 1349 (D.C. Ark. 1980) (calling the traditional rule the "better rule"); *Higgins v. City of Fillmore*, 639 P.2d 192, 193 n.2 (Utah 1981) ("Even when an owner is not entirely responsible for the delay, but has contributed thereto, he may be precluded from obtaining liquidated damages."). We believe that Kansas would adopt the modern view and allow liquidated damages to be apportioned when faced with damages that are in fact divisible, as they were here.

At oral argument Hutton suggested that the period of delay in this case was *not* in fact divisible, for a day of delay in one part of the year might (because of weather, for instance) be more significant than one in another part of the year. But the very purpose of the contract's liquidated-damages provision was to avoid requiring proof of the significance of individual days of delay; the contract provides for an undifferentiated sum of $500 per day, regardless of the time of

year or other characteristics of the delay. Now is not the time for Hutton to contend that days of delay are nonfungible.

We affirm the district court's decision to apportion delay in awarding liquidated damages.

## C.    Prejudgment Interest

Hutton contests the district court's denial of prejudgment interest on its damages award. But its argument is without merit. Under Kansas law prejudgment interest is generally allowable on liquidated claims and "may be allowable on unliquidated damages where necessary to arrive at full compensation." *Miller v. Botwin*, 899 P.2d 1004, 1012 (Kan. 1995). In either event the award "is a matter which lies within the sound discretion of the trial court." *Id.* at 1013; *see also Leeper v. Schroer, Rice, Bryan & Lykins, P.A.*, 736 P.2d 882, 887 (Kan. 1987) (prejudgment interest on liquidated damages is a matter of equitable discretion rather than a matter of legal right). We therefore review denial of an award for abuse of discretion. *See Hofer v. UNUM Life Ins. Co. of Am.*, 441 F.3d 872, 879 (10th Cir. 2006).

"A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same becomes definitely ascertainable by mathematical computation. The fact that a good faith controversy exists as to whether the party is liable for the money does not preclude a grant of prejudgment interest." *Miller*, 899 P.2d at 1012 (citations and

internal quotation marks omitted).  The court's award of $24,659.47 to Hutton did not represent a liquidated amount before the entry of judgment because the amount itself, not just the liability for that amount, was subject to dispute.  *See* Restatement, *supra*, § 354 cmt. c, illus. 9 ("A contracts to build a bungalow for B for $30,000.  After completion but before B has paid the final $6,000, B occupies the bungalow but refuses to pay the balance because the workmanship and materials are unsatisfactory.  A sues B and recovers only $4,000 on the ground that B's claim entitles him to compensation in the amount of $2,000.  The sum of $4,000 was not sufficiently definite to give A a right to interest on it.  The allowance of interest is within the discretion of the court.  The fact that A was himself in breach will be considered.").  Hutton asserts that at a minimum, *some* of the $110,159.47 retainage was undisputedly due to Hutton (and therefore liquidated).  Oddly, though, it does not identify a particular liquidated amount.  More importantly, its assertion is simply incorrect.  Hutton stated in its trial brief that "Coffeyville claims that the project was not completed timely and that it is entitled to an offset against any monies it owes to Hutton for liquidated damages."  Aplee. Supp. App. at 338.  Similarly, Hutton states in its opening brief on appeal that "after Hutton filed the present litigation, Coffeyville claimed 633 days of liquidated damages under the contract, for a total of $316,500.00."  Aplt. Br. at 11.  Clearly, then, the City disputed that it owed any portion of the

-28-

retainage to Hutton, and no portion of the award of $24,659.47 was liquidated prior to judgment.

In any event, whether or not the damages were liquidated, the district court acted well within its discretion in denying prejudgment interest, particularly because Hutton was itself partially at fault and the City's presuit letter of August 5, 2002, offered Hutton more than what it later obtained through its judgment.

## D. Special Interrogatory on Modification of Contract

The contract between Hutton and the City called for a commencement date to be "determined by the Engineer after notice in writing . . . from [Hutton] that [Hutton] has sufficient materials to warrant commencement and continuation of construction." Aplt. App. Vol. IV at 933. At a preconstruction conference on August 4, 2000, this date was set at August 9, 2000, although Hutton has contended that the date was not set properly.

On August 14 Hutton requested "that the commencement date be adjusted to October 23, 2000, due to the insufficient material being on hand." *Id*. at 1066. The October 10 response from the Engineer conveyed the City's acceptance of the request, but subject to a condition: "Coffeyville is willing to forgo liquidated damages provided that the project is entirely completed within 45 days as defined in the contract, with construction beginning on October 23, 2000." *Id*. at 1069. That is, the City proposed to agree to Hutton's request if construction was

completed within 45 days from the new date; otherwise, the City reserved the right to seek liquidated damages for delays that occurred before October 23.

The jury found that the commencement date was October 23, 2000, and that construction was not complete until May 4, 2001. Because the jury further found that Hutton was entitled to only 20 extra days due to bad weather, construction took far longer than the 45 days allowed. The jury also found that the parties had modified the liquidated-damages provision according to the terms set forth in the October 10 letter. Therefore, the district court, in computing damages, included 75 days of delay from August 9 to October 23, 2002.

Hutton challenges the addition of those 75 days. It focuses on Question 1 of the Special Verdict Form, which stated:

> Do you find that the parties agreed to modify certain provisions of the original contract, specifically the construction commencement date and the liquidated damages clause, as set forth in [the] October 10, 2000 letter to [Hutton]?

Aplt. App. Vol. I at 110. Hutton's view appears to be that the commencement date was definitively October 23 and delays preceding that date could not be considered for purposes of liquidated damages even if construction took more than 45 days after October 23. In other words, it is asserting that no effect should be given to the part of the October 10 letter that imposed a condition on agreeing to the October 23 commencement date. It argues that it did not assent to that condition and that the condition was not supported by any consideration. Thus, it

-30-

concludes, the jury could not properly find that the parties modified their contract to incorporate the condition.

Regarding assent, Hutton argues that as a matter of law, "the October 10, 2000 letter from Coffeyville to Hutton did not modify the terms of the liquidated damages clause" and that Question 1 therefore misstates the law. Aplt. Br. at 31. We agree that the letter itself did not adjust the terms of the parties' contract. Because it imposed a condition on acceptance of Hutton's proposal, it was merely a counteroffer. *See* Restatement, *supra*, § 59. But the Special Verdict Form does not presuppose that the letter itself modified the contract; rather, it asks the jury to determine *whether* there was a modification "as set forth in" the letter. This modification need not have occurred on October 10 or by virtue of the letter's mailing. All that was required was acceptance of the terms by Hutton at some point in time.

Hutton argues that the October 10 letter accepted Hutton's proposed commencement date of October 23 and then, separately, requested the modification of other terms of the contract. But the letter simply cannot be read this way; any purported acceptance in the October 10 letter is made "provided that the project is entirely completed within 45 days." Aplt. App. Vol. IV at 1069. There is no freestanding acceptance in the letter, as there would be if the City had expressed a hope or a request instead of a proviso. *Cf.* Restatement, *supra,* § 61 cmt. a, illus. 1 ("A offers to sell B 100 tons of steel at a certain price.

-31-

B replies, 'I accept your offer. I hope that if you can arrange to deliver the steel in weekly installments of 25 tons you will do so.' There is a contract, but A is not bound to deliver in installments.").

The letter thus had no binding effect absent a separate acceptance by Hutton. In Kansas, however, acceptance of a proposed modification of a contract need not be explicit. "The intent of the parties to modify a contract can be implied from their conduct if they do not continue to act according to the original terms of the contract." *Galindo v. City of Coffeyville*, 885 P.2d 1246, 1253 (Kan. 1994). In particular, Hutton's silence in this context—making no response to the City's setting this condition in the letter—can be construed as acceptance. *See* Restatement, *supra*, § 69(1) ("Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance . . . [w]here because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept."). After all, the letter was responding to a request by Hutton "that the commencement date be adjusted" to a date more than two months after the previously set date. If Hutton would have preferred to keep that earlier commencement date (although perhaps reserving the right to litigate its propriety) rather than to accept the City's reasonable conditions (reasonable in that Hutton would suffer no adverse consequence if it could perform with as much speed as the contract originally called for), one would expect it to express its

-32-

opposition. Or at least the jury could reasonably have drawn that inference and found that Hutton and the City had agreed to the terms of the October 10 letter.

Hutton further argues in its reply brief that the contract could not have been modified as set forth in the October 10 letter because the parties did not use the same City form that the parties had used in July 2000 to modify the contract. But we do not consider arguments raised for the first time on appeal in a reply brief. *See United States v. Hall*, 473 F.3d 1295, 1301 n.1 (10th Cir. 2007). In any event, this argument is unconvincing. Although the prior conduct of parties can of course aid courts in interpreting their agreement, Hutton has given us no reason to believe that the parties bound themselves to make all contract amendments using the same form.

We also reject Hutton's contention that the modification—or, to be more precise, the condition imposed by the City—was not supported by consideration. If nothing else, the City gave up its right to insist on the commencement date set at the preconstruction conference. Even if it were ultimately determined that the City had improperly set the date at that conference, forbearance from a colorable claim is sufficient consideration. *See Schiffelbein v. Sisters of Charity*, 374 P.2d 42, 45 (Kan. 1962) ("Forbearance to sue can be good consideration for a promise, regardless of the actual validity of the claim, if the one who forbears has a reasonable and sincere belief in its validity."); *Evco Distrib., Inc. v. Brandau*, 626

P.2d 1192, 1196 (Kan. Ct. App. 1981) ("The principle that forbearance may constitute consideration to support a contract is established in Kansas.").

Hutton also seems to attack Question 1 as a misstatement of contract law, but the instruction does not in fact state any law. And as the City's brief points out, a separate jury instruction fully laid out the law governing the modification of contracts, including the requirement of consideration. We hold that there was no error in asking Question 1 or in the jury's answering it in the affirmative.

### E.    Jury Questions

During its deliberations the jury asked the court to clarify several matters concerning the computation of liquidated damages. The questions were posed as relating to Question 6 on the Special Verdict Form, which stated:

> If you answered [that the City breached its duty of good faith and fair dealing], you must now determine the number of days for which the City, due to its breach of its duty of good faith and fair dealing, should not recover liquidated damages. Please state the number of days below.

Aplt. App. Vol. I at 111. The jury first asked:

> Question 6
>
> Regards to total number of liquidated damage days—Are we looking at the City of Coffeyville potential liquidated damages equal to (633 × 500) $316,500
>
> or
>
> Is it to be the total days between Construction Commencement Date and Completion Construction Date that we have established from the evidence.

-34-

*Id*. at 77.  The court responded:

Dear Jury:

Question 6 does not ask for the number of days of liquidated damages.  Rather, Question 6 asks for the specific number of days for which the City should not recover liquidated damages, due to a breach of its duty of good faith and fair dealing.

*Id*.  The jury followed up with another question:

Question 6

Does 142 days compute to $71,000 (142 days × $500 liquidated damages) in damages awarded to Hutton?

Please circle

Yes          or          No

*Id*. at 78.  The court responded:

Dear Jury,

This question, like several other questions asks about matters that are factual in nature, and it is <u>never</u> appropriate for the Court to answer such questions.  Question 6 asks for a number of days, not a monetary amount.

*Id*.  Finally, the jury asked:

Question:

Please clarify—

How many days is the City charging Hutton for liquidated damages.

*Id*. at 79.  The court answered:

Dear Jury,

The answer to your question is something you, the jury, will have to determine from the evidence.

*Id.*

Hutton challenges the district court's responses and seeks a new trial. Hutton's argument is not clear, but it appears to be arguing either that the jury questions themselves demonstrate the jury's confusion and that this alone requires a new trial or that the court's responses were somehow improper. "A district court's actions in responding to questions from the jury, as well as supplemental instructions given to the jury, are reviewed for abuse of discretion." *Allen v. Minnstar, Inc.*, 97 F.3d 1365, 1370 (10th Cir. 1996).

The responses that the district court chose to give did not misstate the law or otherwise mislead the jury. The court simply emphasized to the jury that it was the jury's function to answer factual questions, and that the court would not supply advice on how to answer these factual questions. We cannot find any fault in the way the court responded to the questions.

Neither do Hutton's arguments make clear precisely how the jury was confused in any relevant respect. To begin with, even if the jury was initially confused about its proper role as fact finder, the district court's answers likely cleared up the confusion. "[P]laintiff's argument is entirely speculative and could arguably be raised in any case in which a jury presents questions to a trial court. As we have previously noted, a verdict will not be upset on the basis of

-36-

speculation about possible jury confusion." *Id*. at 1373 (internal quotation marks omitted); *see Howard D. Jury, Inc. v. R & G Sloane Mfg. Co.*, 666 F.2d 1348, 1351 (10th Cir. 1981) ("[T]he question before us is whether the confusion in the jurors' minds was eliminated before the verdicts were returned, not whether the jurors were confused prior to that time."). Hutton argues only that "the jury questions demonstrate that the jury was confused with regard to how many days it should allocate for liquidated damages," Aplt. Br. at 36; but the jury's questions show—at most—that it may have been confused about the dollar figure owing from Hutton to the City or the number of days with which Hutton would be charged in light of the jury's other answers. The jury's potential confusion over matters unrelated to its special verdicts is irrelevant.

## III. CONCLUSION

The district court's judgment is AFFIRMED.